**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

RONALD DUANE DUNHAM,

                      Petitioner,

v.

STAN SHIFF, et al.,

                   Respondents.

Case No.:  18cv0863 GPC (LL)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I.     INTRODUCTION

Petitioner Ronald Duane Dunham, a state prisoner proceeding pro se with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition" or "Pet."), challenges his conviction for various financial crimes in San Diego Superior Court case no. SCD246838.  The Court has read and considered the Petition, [ECF No. 1], the Answer and Memorandum of Points and Authorities in Support of the Answer [ECF No. 27-1], the Traverse [ECF No. 39], the lodgments and other documents filed in this case, and the legal arguments presented by both parties.[1]  For the reasons discussed below, the petition is **DENIED.**

---

[1] Page numbers for docketed materials cited in this Order refer to those imprinted by the court's electronic case filing system.

## II. **FACTUAL BACKGROUND**

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The state appellate recounted the facts as follows:

> Cherokee Village was a small northeastern city in the State of Arkansas, with a population of around 4,500 people. The area contained approximately 20,000 undeveloped lots, typically purchased and sold by individuals. The suburban improvement district (SID) maintained the community's roads and amenities (golf courses, lakes, and recreation centers) and provided for its safety needs. Lot owners were required to pay an annual improvement district tax or assessment to the SID; otherwise, the SID could initiate enforcement proceedings that would result in the lots' foreclosures.
>
> At any given time, thousands of lots were in a state of tax delinquency, and the SID experienced continuing financial difficulties as a result. In 2002, two longtime inhabitants of Cherokee Village, Eben Daggett and Ron Rhodes, formed American Land Company (ALC). ALC wished to sell tax delinquent lots to new owners who would pay their taxes, thereby generating revenue for the SID. In November 2002, ALC entered a contract with the SID in which the SID granted ALC the exclusive right to market and sell foreclosable tax delinquent lots (delinquent lots). ALC agreed to pay the SID 5 percent of the gross sales price of any delinquent lot that ALC sold. The contract automatically renewed for five-year terms.
>
> ALC began marketing and selling delinquent lots through an online auction, eBay. On eBay, "the market priced the lots," i.e., the highest bidder would obtain a listed lot. Later, ALC also sold delinquent lots to "dealers," or people who wished to purchase more than 10 lots at a time. According to Rhodes, between 2002 and 2007, the highest price for a general lot, around one-third of an acre in size, was about $3,000 or $3,500.
>
> In 2004, Dunham became interested in Cherokee Village, and Rhodes and Daggett met with him to discuss the dealer program. They explained to him ALC's contract with the SID, including how ALC was able to obtain

good title to the delinquent lots and market/sell them. The trio also discussed the prices the lots would sell for on the open market. Dunham wanted to market lots in California.

In March 2004, Dunham proposed a purchase agreement to ALC (letter of intent), which ALC firmly rejected. Dunham sought to obtain 1,000 delinquent lots from the SID's inventory of lots on certain specified terms, including: (1) ALC would cease "all sales and marketing efforts" of lots on the Internet; (2) ALC would agree to a noncompetition agreement; and (3) ALC would give Dunham the exclusive right to market and sell the SID's inventory of delinquent lots for a certain time period. In response, ALC refused to cease its Internet sales; would not agree to not compete under any circumstances; and refused to give Dunham exclusive marketing rights. ALC never subsequently altered its marketing practices and continued selling delinquent lots on eBay. The effect of ALC's continued sales of delinquent lots on its own terms was to compete on pricing. Dunham obtained from ALC two options to purchase a block of 400 lots for $1,000 each.

At the outset, Dunham focused his efforts on selling lots to the victims, but before long, he also sold membership interests in Gold Coast Real Estate Fund, LLC (GCREF), a company he managed. Dunham convinced some of the victims to contribute their purchased lots to GCREF in return for an interest in GCREF. The proposed business of GCREF, according to its private placement memorandum (PPM), included the sales of lots and development of homes in Cherokee Village. Dunham arbitrarily valued lots and interests in GCREF, and on four or five occasions directed his administrative assistant to falsify investors' signatures on required documentation.

Dunham represented to the victims that he controlled in excess of 5,000 lots and that once he controlled all the lots, he was going to build environmentally friendly homes, run a big media campaign, and mark up the prices of the lots. Dunham offered the victims more than just a "dirt lot" in Cherokee Village; he offered a "package of development," i.e., the professional services of Dunham's company to finance, build homes, and/or sell the lots. Dunham did not, however, inform any of the victims of the ALC-SID contractual arrangement described *ante*. Although the PPM warned of general investment risks, it did not disclose to investors the ALC-SID contract, ALC's exclusive marketing rights, and Dunham's unsuccessful attempts to obtain ALC's rights.

Douglas Fisher and Purvey Martin, paid agents of Dunham, induced almost all of the victims to invest with Dunham.  Fisher and Martin were insurance agents by trade with little or no experience in real estate investments; Dunham persuaded both of them to invest in Cherokee Village lots.  Dunham told Fisher and other investors: (1) he owned a "broker dealer" firm on Wall Street; (2) he had done about 4,000 real estate deals and was extremely successful in real estate; and (3) he had gained invaluable real estate experience while growing up from his family's business.  Fisher was highly impressed by Dunham's apparent success and would relay Dunham's background and plans to his insurance clients.

Dunham regaled Fisher and Martin with his development plans, including a national marketing campaign using celebrity Ed McMahon as a spokesperson.  Dunham assured them that his marketing and development plans would increase lot values in a short period of time.  He held investor events in his office, on a yacht, and in a La Costa hotel.  Dunham did not tell Fisher and Martin anything about the ALC-SID contract, ALC's ability to sell delinquent lots and its practice of doing so on eBay, and ALC's refusal to agree to a noncompetition agreement or to grant him the exclusive right to market delinquent lots.  As a result, neither Fisher nor Martin informed their clients and friends about those facts; had they known, they would not have invested in Cherokee Village or recommended the investment to others.

*Beverly D.'s Lots (Grand Theft, Elder Theft, and Securities Fraud, Counts 1-3) and Promissory Note (Grand Theft and Elder Theft, Counts 4-5)*

In 2006, Fisher suggested to his client, Beverly D., a widowed homemaker, that she invest in Cherokee Village.  Fisher informed her of what Dunham had said about the project and Dunham's considerable success and experience in real estate.  Furthermore, Beverly was told that it would take only one year to achieve a profit, she did not need to do anything but hang on to the investment, there would be an Ed McMahon "publicity program," and Dunham's company would sell the lots for her.  In March 2006, Beverly invested $68,999 for nine lots.  Beverly attended Dunham's yacht party, where she was introduced to Ed McMahon and where Dunham referred to the attendees as his "family."  She continued paying taxes on the lots every year.  She did not at any time know the lots' market value and did not know how to sell them.  She knew nothing about ALC or its activities; she trusted Fisher and relied on his investment advice.

/ / /

In October 2006, Beverly was persuaded to invest more money with Dunham. Fisher took her to Dunham's office, where Dunham advised her to borrow $350,000 using the equity in her home and give the money to him to invest. Her home was already paid off, and Beverly was reluctant to invest such a large sum of money and incur a new debt. Dunham assured her that she needed a mortgage interest tax deduction and he would invest the money in GCREF and other real estate. She wire-transferred $350,000 to a bank account for the benefit of "Ron Dunham/Gold Coast Partners." In exchange, Dunham gave Beverly a promissory note with a two-year maturity and stated interest rate of 12 percent.

In October 2008, Beverly called Dunham to get her money back, but he claimed not to have the money to repay her. He wanted to renegotiate the terms of her note and stretch out its due date for up to five years. Dunham's failure to pay Beverly back felt like a "crime to [her]," but she did not think about calling the police. In terms of her specific knowledge of facts, she knew only that he had not paid her back when he originally said he would. Beverly hired a lawyer to communicate with Dunham about repayment, but the lawyer advised her against accepting Dunham's terms. Subsequently, a friend told Beverly about the Gaston & Gaston (Gaston) law firm; she first spoke to a Gaston lawyer in late May or June 2009. Beverly ultimately joined a civil lawsuit led by Gaston in order to get repaid. As of Dunham's trial, she still owned her lots and had not been repaid.

*Raymond and Caroline M.'s Lots (Grand Theft, Elder Theft, and Securities Fraud, Counts 6-8)*

Raymond M. had been retired since 1991 and was formerly a project coordinator for a telephone company. In 2006, he and his wife needed money to take care of their ailing mothers. He talked to Fisher, who suggested they invest in Cherokee Village lots. Fisher was very excited about the project, had purchased lots for himself, and informed them of Dunham's impressive background. Raymond was further informed that Dunham would advertise the lots as a resort with the assistance of Ed McMahon, the lot prices would double as a result, and in a short time period "Dunham's group" would sell the lots for investors. In February 2006, Raymond invested $149,941 to purchase 20 lots (at about $7,500 per lot). He and his wife had no intention of moving to Cherokee Village, and they expected to profit from the lots' sales in about a year. He had no knowledge of the ALC-SID contractual arrangement.

///

Between May 2006 and December 2007, Raymond did some Internet research on lot prices and questioned Fisher on what seemed like low property values. Raymond was assured by Fisher and Dunham that the lot values were in the range of $11,000 to $14,000 and that Dunham was working on the Ed McMahon commercial. Raymond first met with Gaston in June 2009 because he realized that "nothing [was] happening" to run an Ed McMahon television commercial or increase the lot values. Raymond still had no information regarding the ALC-SID arrangement. At the time of trial, Raymond had paid $21,000 in property taxes on his lots and believed they were each worth $1,200 based on the listed sales price of a neighboring lot.

*Jay and Marilyne A.'s Lots (Grand Theft, Elder Theft, and Securities Fraud, Counts 9-11)*

Marilyne A. contacted Fisher for investment opportunities, who suggested she purchase lots in Cherokee Village. Fisher told her that the Dunham group would run an Ed McMahon television commercial to advertise lots, and then sell or develop the lots for investors. Fisher told her that Dunham was "very well-versed in this type of real estate." In March 2006, Marilyne purchased six undeveloped lots for $46,084, with the intention of profiting from their sales when the Dunham group sold the lots for them. Marilyne considered keeping one of her six lots to build on, but her primary motive was to realize a profit by the time she retired in 2010.

In 2008, Marilyne did Internet research, read a few blogs, and learned that Cherokee Village was generally a "bad investment." She stopped paying taxes on her lots. At some point, she learned from Fisher that a group was suing Dunham to try and get their money back. She did not want to be involved in litigation and thought she had just made a bad investment. She knew nothing about the ALC-SID contractual arrangement and her decision to invest would have "absolutely" been impacted had she known of it.

*David and Joyce M.'s Lots (Grand Theft, Elder Theft, and Securities Fraud, Counts 12-14) and Investment in GCREF (Securities Fraud, Count 15)*

David M. was referred to Dunham through Martin. David had managed a bank's properties (e.g., branch offices) for many years of his career, but had not sold real estate since the 1960's. Joyce M. was a former actress. They were retired when they turned to Martin for investment

advice, and they trusted him because he was a good friend. Martin called Dunham a "genius" at real estate and brought him to the couple's house. Dunham described his plans to market the properties, develop them into homes, and resell them for investors. David and Joyce did not intend to live in Cherokee Village or hold on to the properties for long; rather, they needed money for retirement.

In 2005, David invested $50,000 to purchase 13 lots. Subsequently, he and his wife visited Cherokee Village and observed the surroundings. They also attended Dunham's marketing seminars. In February 2007, Dunham persuaded them to contribute their deeded lots to GCREF, and they paid an additional $6,400 in recording and transfer fees. In exchange, they received an interest in GCREF with a stated "paper" value of $98,000.

In 2008 or 2009, David asked whether he could get his money or lots back, but Dunham stated that he could not return anything back yet due to the downturn in the real estate market. David was aware that the economy was in a deep recession and believed that he still held a valuable investment in GCREF. Every year between 2007 and 2012, Dunham sent him a schedule K-1 financial statement showing the value of David's investment ranging between $80,000 to $100,000.

In February 2011, Joyce called Dunham to ask for the couple's money back, to which Dunham responded that he had no money to give her. In or after September 2011, Dunham sent David a letter disclosing a confrontational meeting he had had with another victim, James W. In the letter, Dunham accused James of spreading "misinformation" about the real estate fund, blamed ALC and the SID for keeping property values low, and referenced a lawsuit that Dunham had filed against ALC. Subsequently, David spoke to James.

David was unable to recoup any cash from Dunham. He testified that his decision to invest would have been impacted had he known in advance about ALC's contract with the SID.

*James and Allison W.'s Investment in GCREF (Grand Theft and Securities Fraud, Counts 16-17)*

In 2006, James painted cars for a living. He had recently sold his home and wished to invest the proceeds while he was doing volunteer work. Martin, who was a very close friend, suggested that he invest in Cherokee

Village, relaying to James everything he knew from Dunham about GCREF. Martin told James that Dunham's company would develop lots it had acquired at a "good price" and build efficient "smart homes" on the lots. Martin also told James that GCREF would likely pay a 10 percent dividend within a year of operations. James was not informed, prior to investing, of ALC's contractual arrangements with the SID or any of ALC's activities. In December 2006, James invested $250,000 in GCREF. He and his wife then lived abroad for over a year.

In March 2008, James had not received a dividend and began asking Martin and Dunham questions about the fund's operations. Dunham consistently reassured him that the project was delayed, but ongoing. In 2009, James asked orally, and then in writing, for his investment back. Dunham asked him to be patient, told him everything was fine, and told him that he was working on returning his investment. In August 2009, Dunham stated in an e-mail that he may be able to repay James in the next 60 days. In February 2010, Dunham offered to return half of James's investment in the form of property rather than cash.

James first met with Gaston in 2010, but was unable to join the civil lawsuit against Dunham. In September 2011, James confronted Dunham at his home and demanded the return of his money, which prompted Dunham to call the police. Dunham continuously sent James his annual K-1 financial statements through 2013 showing James's fund "value" of over $232,000.

*Herbert T. and Elizabeth G.'s Lots (Grand Theft, Elder Theft, and Securities Fraud, Counts 18-20)*

Herbert T. met Dunham in the late 1970's and trusted Dunham's investment advice over the years. In November 2004, Dunham persuaded Herbert and his wife to invest about $96,200 to purchase lots in Cherokee Village. According to Herbert, "[Dunham] said they had exclusive rights to those properties, those lots. He also said that Ed McMahon was going to be the spokesperson on television commercials to sell these properties. Thirdly, they were going to build state of the art eco-friendly houses, large retirement community on those properties . . . . [T]he value of those lots would go up dramatically, and that's how we would make money, by selling them." Herbert had no experience selling real estate and did not expect to sell the lots; rather, "Dunham and company were going to sell them." Based on what Dunham told him, Herbert expected to realize a profit without needing to do anything except provide Dunham money.

In December 2006, Dunham convinced Herbert to transfer his lots to GCREF. Herbert did not suspect anything was amiss with his investment until he heard that Dunham had filed a lawsuit against ALC and the SID, which was after October 2009. Dunham had not previously told Herbert anything about ALC and, to the contrary, claimed he had "exclusive rights" to sell lots in Cherokee Village. Had Herbert known about the ALC-SID contractual arrangement, he would not have invested in Cherokee Village.

(Lodgment No. 83, ECF No. 28-83 at 4-14.)

## III.  PROCEDURAL BACKGROUND

On December 9, 2014, the San Diego County District Attorney's Office filed a Sixth Amended Information charging Ronald Duane Dunham with seven counts of grand theft, a violation of California Penal Code § 487(a) (counts one, four, six, nine, twelve, sixteen and eighteen), six counts of theft from an elder, a violation of California Penal Code § 368(d) (counts two, five, seven, ten, thirteen and nineteen), seven counts of making a false in connection with the sale of a security, a violation of California Corporations Code §§ 25401 and 25540 (counts three, eight, eleven, fourteen, fifteen, seventeen and twenty), and one count of perjury by declaration, a violation of California Penal Code § 118(a). (Lodgment No. 88, ECF No. 28-88 at 5-16.) As to counts one through twenty, the information alleged that the prosecution was commenced within the statute of limitations, within the meaning of California Penal Code § 803(c). (*Id.*) As to counts one through three, six through nine, and eighteen through nineteen, the information also alleged that Dunham stole in excess of $50,000. (*Id.*) And as to counts four, five, sixteen and seventeen, the information alleged that Dunham stole in excess of $150,000. (*Id.*) Finally, the information alleged that Dunham had stolen in excess of $500,000 in the course of his criminal conduct, within the meaning of California Penal Code § 186.11 and that Dunham was ineligible for probation if convicted of theft in excess of $100,000. (*Id.*)

Following a jury trial, Dunham was convicted of all counts and the jury found all allegations to be true. (Lodgment No. 9, ECF No. 28-9 at 192-210.) Dunham was sentenced to a prison term of 12 years. (*Id.* at 212-17.)

Dunham appealed his conviction to the California Court of Appeal for the Fourth Appellate District. (Lodgment Nos. 80-82, ECF Nos. 28-80 – 28-82.) Two of the three justices upheld Dunham's convictions in counts 2-3, 5, 7-8., 10-11, 13-17, 19-21, and reversed his convictions and true findings on the enhancement allegations in counts 1, 4, 6, 9, 12, and 18. (Lodgment No. 83, ECF No. 28-83.) A third justice would have reversed all the convictions because the verdict forms did not correctly ask the jury whether the prosecution was timely. (*Id.* at 66-74.) Dunham filed a petition for rehearing in the state appellate court, which was denied. (Lodgment Nos. 84-85, ECF Nos. 28-84 – 28-85.) Thereafter he filed a petition for review in the California Supreme Court, which was denied without citation of authority. (Lodgment Nos. 86-87, ECF Nos. 28-86 – 28-87.)

Dunham filed a pro se Petition for Writ of Habeas Corpus in this Court on May 4, 2018. (ECF No. 1.) Respondent filed an Answer and Memorandum of Points and Authorities in Support of Answer on December 24, 2018. (ECF Nos. 27, 27-1.) Dunham filed a Traverse on March 5, 2019. (ECF No. 39.)

## IV.  **DISCUSSION**

Dunham's petition contains eleven grounds for relief. Ground one argues the unanimity instruction given to the jury was incorrect. (Pet., ECF No. 1 at 5-6, 42-48.) Ground two contends there was an error with the verdict forms which resulted in an ambiguous verdict. (*Id.* at 7-8, 39-42.) Grounds three through six allege there was insufficient evidence presented to establish the prosecution was commenced within the statute of limitations period and to support Dunham's convictions for theft by false pretenses, embezzlement and securities fraud. (*Id.* at 8-12, 34-38, 48-51, 56-63.) In ground seven Dunham alleges evidence of uncharged acts was improperly admitted. (*Id.* at 12-13, 63-67.) Ground eight contends the jury instructions failed to define specific terms. (*Id.* at 13, 52-56.) Ground nine alleges there was insufficient facts to support an allegation contained in the information. (*Id.* at 14, 73-74.) Dunham argues in ground ten

/ / /

that the prosecutor committed misconduct.  (*Id.* at 14-15, 73-74.)  Ground eleven alleges trial counsel was ineffective.  (*Id.* at 16, 74-75.)

Respondent argues that claims three and nine fail to state a federal constitutional question, grounds two, seven, eight, nine and ten are procedurally defaulted, and parts of grounds two, three, seven and nine are unexhausted.  (Answer, ECF No. 27-1 at 1-77.) Respondent also contends the claims fail on the merits.  (*Id.* at 77-241.)

A.  *Procedural Default*

The Ninth Circuit has held that because procedural default is an affirmative defense, in order to establish a claim is procedurally defaulted, Respondent must first "adequately [plead] the existence of an independent and adequate state procedural ground . . . ."  *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).  In order to place the defense at issue, Dunham must then "assert[] specific factual allegations that demonstrate the inadequacy of the state procedure . . . ."  *Id.*  The "ultimate burden" of proving procedural default, however, belongs to the state.  *Id.*  If the state meets its burden under *Bennett*, federal review of the claim is foreclosed unless Dunham can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

A state procedural rule is "independent" if the state law basis for the decision is not interwoven with federal law.  *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983); *Harris v. Reed*, 489 U.S. 255, 265 (1989).  A ground is "interwoven" with federal law if the state has made application of the procedural bar depend on an antecedent ruling on federal law such as the determination of whether federal constitutional error has been committed. *See Ake v. Oklahoma*, 470 U.S. 68, 75 (1985).  "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'"  *Walker v. Martin*, 562 U.S. 307, 316 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 60 (2009).) All cases cited by a state court must be independent and adequate to bar federal review of the claims.  *Washington v. Cambra*, 208 F.3d 832, 834 (9th Cir. 2000).

The "cause" prong is satisfied if Dunham can demonstrate some "objective factor" that precluded him from raising his claims in state court, such as interference by state officials or constitutionally ineffective counsel. *McClesky v. Zant*, 499 U.S. 467, 493-94 (1991). "Prejudice [sufficient to excuse procedurally barred claims] is actual harm resulting from the alleged error." *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). The Supreme Court has limited the "miscarriage of justice" exception to petitioners who can show that "a constitutional violation has probably resulted in one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In *Wood v. Hall*, 130 F.3d 373, 379 (9th Cir. 1997), the Ninth Circuit held that "actual innocence" means factual innocence, not simply legal insufficiency; a mere showing of reasonable doubt is not enough.

    1. *Grounds Two, Seven, Eight and Ten*

In ground two, Dunham argues that "[t]here was no clear jury determination that Counts 1-20 were timely prosecuted" because the special verdict forms given to the jury erroneously asked the jury to determine whether the victims had or had no actual or constructive knowledge of the crime within four years of the date prosecution commenced. (Pet., ECF No.1 at 7-8, 39-42.) In ground seven, he contends the admission of uncharged acts rendered his trial unfair. (*Id.* at 12-13, 63-67.) In ground eight, he argues the failure to define specific terms in the jury instructions violated his due process rights. (*Id.* at 13, 52-56.) And in ground ten, he contends the prosecutor committed misconduct in various ways. (*Id.* at 14-15, 69-73.) Respondent argues that the claims are procedurally defaulted because the state appellate court found that counsel failed to object in the trial court, and the claims were therefore forfeited. (Answer, ECF No. 27-1 at 52-59.)

In *Melendez v. Pliler*, 288 F.3d 1120 (9th Cir. 2002), the Ninth Circuit concluded that California's contemporaneous objection rule has been consistently applied "when a party has failed to make *any* objection to the admission of evidence." *Id.* at 1125, citing *Garrison v. McCarthy*, 653 F.2d 374, 377 (9th Cir. 1981). In addition, as Respondent

18cv0863 GPC (LL)

notes, the Ninth Circuit has found California's contemporaneous objection rule functions as a bar to both evidentiary and non-evidentiary issues. *See Drayton v. Castro*, 2009 WL 689713 at *2 (9th Cir. 2009)[2] (concluding petitioner's claim regarding an ambiguous verdict that was resubmitted to the jury was procedurally defaulted because petitioner did not object to it at the time and therefore waived the claim); *see*, *e.g.*, *Reno v. Davis*, 2017 WL 4863071 at *10 (C.D. Cal. 2017); *Schmitz v. Lizarraga*, 2016 WL 2855066 at *9 (E.D. Cal. 2016). Accordingly, Respondent has "adequately [plead] the existence of an independent and adequate state procedural ground . . . ." *Bennett*, 322 F.3d at 586. Dunham has not asserted any "specific factual allegations that demonstrate the inadequacy of the state procedure . . . ." and federal review of the claim is therefore foreclosed unless Dunham can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Dunham claims counsel's ineffectiveness is cause for the default, but ineffective assistance of counsel can constitute cause only if it is in itself a constitutional violation. *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000). As discussed below in sections IV(C)(9), Dunham has not established that counsel was ineffective. Nor has he established either actual prejudice or a fundamental miscarriage of justice because as discussed in section IV(C)(3), (5), (6), and (8), below, the claims are meritless.

2. *Ground Nine*

Ground nine concerns California Penal Code § 186.11. Under that section, a defendant is subject to an enhanced sentence based upon the amount of money stolen from the victims. Cal. Penal Code § 186.11(a)(2) (West 2018). The statute also permits the district attorney to freeze a defendant's funds and preserve them for restitution to

---

[2]  Pursuant to Ninth Circuit Rule 36-3(c), "Unpublished decisions and orders of [the Ninth Circuit] issued on or after January 1, 2007 may be cited to the courts of this circuit in accordance with FRAP 32.1."

victims. (*Id.*) Dunham claims the allegation was not properly pled in the information and that the sentence enhancement he received was therefore unlawful. He also contends the court improperly awarded restitution to third party claimants. (Pet., ECF No. 1 at 14, 73-74.)

Respondent contends this claim is procedurally defaulted because the state appellate court determined that he could have, but did not, raise the claim in the trial court or on appeal, citing *In re Seaton*, 34 Cal. 4th 193, 200 (2004). (Answer, ECF No. 27-1 at 59-61.) *Seaton* cites *In re Dixon*, 41 Cal.2d 756, 759 (1953). As Respondent notes, the Supreme Court concluded in *Johnson v. Lee*, 578 U.S. __, 136 S. Ct. 1802, 1804 (2016) that the *Dixon* rule is independent and adequate. Accordingly, Respondent has "adequately [plead] the existence of an independent and adequate state procedural ground . . . ." *Bennett*, 322 F.3d at 586. Dunham has not asserted any "specific factual allegations that demonstrate the inadequacy of the state procedure . . . " and federal review of the claim is therefore foreclosed unless Dunham can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Dunham claims counsel's ineffectiveness is cause for the default, but ineffective assistance of counsel can constitute cause only if it is in itself a constitutional violation. *Edwards*, 529 U.S. at 452. As discussed below in section IV(C)(9), Dunham has not established that counsel was ineffective. Nor has he established either actual prejudice or a fundamental miscarriage of justice because as discussed in section IV(C)(7) below, the claim is meritless.

B. *Exhaustion*

Respondent argues that some of Dunham's claims are unexhausted because they were not "fairly presented" to the California Supreme Court. Respondent states as follows:

Here, Dunham did not "fairly present" to the California Supreme Court his contention in Ground Two that CALCRIM No. 3410 erroneously

conflates a finding of guilty [sic] with timeliness (Doc. 1 at 8 of 341, 42 of 341); the federal constitutional basis for Ground Three (Doc. 1 at 8 of 341 – 9 of 341, 34 of 341 – 38 of 341, 173 of 341, 257 of 241 – 273 of 341); his contention in Ground three that the trial court erred in denying his pre-trial California Penal Code section 995 motion to dismiss counts 1 through 20 (Doc. 1 at 8 of 341 – 9 of 341, 259 of 341 – 260 of 341); the federal constitutional basis for his instructional error claim in Ground Seven (Doc. 1 at 13 of 341, 65 of 341 – 67 of 341); or the federal constitutional basis for the restitution-related claims in Ground Nine (Doc. 1 at 14 of 341, 311 of 341 – 318 of 341.)

(Answer, ECF No. 27-1 at 63-75.)

As to Dunham's claim regarding CALCRIM No. 3410, Respondent contends Dunham raised this claim for the first time in the petition for review he filed in the California Supreme Court. (*Id*.) As Respondent notes, a petitioner does not properly exhaust a claim when he presents that claim for the first time to the state's highest court on discretionary review. *Casey v. Moore*, 386 F.3d 896, 918 (9th Cir. 2004). Respondent also argues that although Dunham raised the federal constitutional grounds for grounds two, three, seven and nine in the petition for review he filed in the California Supreme Court, he did not raise the federal constitutional grounds for those claims in the briefs he filed in the California Court of Appeal on direct review. (*Id*. at 66-72.) Respondent correctly points out that under the California Rules of Court, the California Supreme Court "will not normally consider any issue on petition for review that could have been but was not timely raised in the briefs filed in the Court of Appeal. (*Id*. at 63-72.)

Accordingly, the above identified claims that are asserted in grounds two, three, seven, and nine are unexhausted. Because no state remedies are still available to Dunham, however, the claims are technically exhausted but procedurally defaulted unless Dunham can show cause and prejudice. *Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011). Dunham has not offered any cause for the default and, as discussed below in sections IV(C)(3), (5) and (7), he has not established prejudice because the claims are meritless. *See Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (stating that a Court

may deny a petition which contains unexhausted claims if it is "perfectly clear that the applicant does not raise even a colorable federal claim").

C. *Merits*

Dunham contends in ground one that the jury was improperly instructed that they need not unanimously agree on the theory of theft nor on the particular acts or omissions that constituted the securities fraud counts. (Pet., ECF No. 1 at 5-6.)  In ground two, he argues the verdict forms were erroneous and therefore the verdict was invalid.  (*Id.* at 7-8.)  Ground three argues that insufficient evidence was presented that the crimes were prosecuted within the statute of limitations.  (*Id.* at 8-9.)  In ground four, Dunham contends insufficient evidence was presented to establish he was guilty of theft by false pretenses.  (*Id.* at 9-10.)  Dunham argues in ground five that there was insufficient evidence presented that he was guilty of embezzlement.  (*Id.* at 10-11.)  In ground six he claims there was insufficient evidence presented that he was guilty of securities fraud.  (*Id.* at 11-12.)  Ground seven contends that admission of uncharged acts violated his right to a fair trial.  (*Id.* at 12-13.)  In ground eight, Dunham argues that the jury instructions improperly failed to define specific terms.  (*Id.* at 13.)  Ground nine contends that his sentence pursuant to California Penal Code § 186.11 was unauthorized due to an error in the charging document, and that the restitution orders made pursuant to that section were also unauthorized.  (*Id.* at 14.)  Dunham argues in ground ten that the prosecutor committed misconduct, and in ground eleven that his trial counsel was ineffective.  (*Id.* at 14-16.)  In addition to the procedural default and exhaustion arguments, Respondent contends the state court's denial of the claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer, ECF No. 27-1 at 77-241.)

1. *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim

adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application

of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

### 2. *Unanimity Instructions (Ground One)*

Dunham contends in ground one that the jury was given two improper non-unanimity instructions. (Pet., ECF No. 1 at 5-6, 42-48.) The first instruction told the jury that they did not need to unanimously agree on the theory of guilt for the theft counts, counts 1, 4, 6, 9, 12, 16 and 18. (Lodgment No. 7, ECF No. 28-7 at 136.) The second instruction told the jury that for the counts charging misrepresentation or omission of a material fact in the sale of a security they did not need to unanimously agree on the acts or omissions Dunham engaged in so long as they all agreed beyond a reasonable doubt that Dunham had committed some material act or omission in the sale of a security. Dunham contends these instructions violated his federal due process right to a fair trial. (Pet., ECF No. 1 at 5-6, 42-48.)

Dunham raised this claim in the petition for review he filed in the California Supreme Court. (Lodgment No. 86, ECF No. 28-86.) Because the California Supreme Court denied the petition without citation of authority, (Lodgment No. 87, ECF No. 28-87), this Court must "look through" to the state appellate court's opinion denying the claim to determine whether the denial was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Ylst*, 501 U.S. at 805-06. That court wrote:

> Dunham contends the jurors received two improper nonunanimity instructions. First, they were instructed they did not need to agree on the form of theft, as follows: "You may not find the defendant guilty of theft unless all of you agree that the People have proved that the defendant committed theft under at least one theory. But all of you do not have to agree on the same theory." (CALCRIM No. 1861.) Dunham argues that under the evidence presented, the jury may not have unanimously agreed on all of the elements of either false pretenses or embezzlement. (*People v.*

*Williams* (2013) 57 Cal.4th 776, 785-786; *People v. Davis* (2005) 36 Cal.4th 510, 561; see CALCRIM No. 3500 [standard unanimity instruction].) Second, Dunham argues that the jury was erroneously instructed that unanimity was not required as to particular misrepresentations or omissions in the context of securities fraud. We conclude there was no reversible error.

. . . .

During closing argument, the prosecutor told the jury that Dunham was being prosecuted under a theory of theft by false pretenses, except for Beverly's promissory note, where the People's theory was theft by embezzlement. The court instructed the jury that Dunham was charged in counts 1, 6, 9, 12, 16, and 18 with grand theft by false pretenses and in counts 4 and 5 with grand theft by embezzlement, and specified the elements of those offenses accordingly. [FN 4: The written instruction for grand theft by false pretenses initially included count 4, but in response to a jury note pointing out the duplication, the court instructed the jurors to disregard count 4 in the grand theft by false pretenses instruction. In any event, because we are reversing Dunham's conviction for count 4, any error in instruction as to count 4 is moot.] The jury also received predeliberation instructions, including a requirement that the verdict on each count must be unanimous. (See CALCRIM No. 3550.)

We conclude there was no reasonable likelihood the jury did not agree on a "particular crime" because the prosecution elected to prosecute each theft count under a particular theory of theft. (*Russo*, *supra*, 25 Cal.4th at p. 1134; *Davis*, *supra*, 36 Cal.4th at p. 561 [potential error when prosecution *does not elect* which of two distinct acts of robbery it was relying on to prove robbery].) The jury was instructed to determine whether Dunham was guilty of theft by false pretenses except as to Beverly's promissory note, where the jury was instructed to determine whether Dunham was guilty of theft by embezzlement. Any error in giving CALCRIM No. 1861 was harmless.

The jury was also instructed, in connection with Dunham's securities fraud charges, that Dunham "is accused of having knowingly made multiple misrepresentations or material omissions," and the People "must prove beyond a reasonable doubt that the defendant engaged in this course of conduct." The court instructed the jury that unanimity was not required as to particular misrepresentations or omissions so long as each juror was convinced beyond a reasonable doubt Dunham committed some

misrepresentations and material omissions that proved his course of conduct.

> The court did not err.  (*Butler*, *supra*, 212 Cal.App.4th at p. 426 ["jurors were not required to agree on the particular misrepresentations or omissions they relied on for the convictions [for securities fraud] because that finding merely relates to the manner of committing the crime."].)  Each count of securities fraud alleged that Dunham sold one security on a specific date.  The court instructed the jury on the elements of securities fraud, which required the People to prove Dunham knowingly made a material misrepresentation or omission in connection with the offer or sale of a security.  The evidence showed, however, that Dunham made compounding and interrelated false and misleading statements, to deceive his agents Fisher and Martin and, through them, most of the victims.  The jurors were not required to agree on the same material misrepresentation or omission to unanimously agree that he was guilty of one crime of securities fraud.  (Accord, *Russo*, *supra*, 25 Cal.4th at p. 1135.)  Thus, there was no instructional error.

(Lodgment No. 83, ECF No. 28-83 at 48-52.)

Criminal defendants in California have a right to a unanimous verdict of guilt.  Cal. Const., art. 1, § 16; *People v. Engelman*, 28 Cal. 4th 436, 442 (2002).  The Supreme Court has held, however, that there is no federal constitutional right to a unanimous verdict.  *Apodaca v. Oregon*, 406 U.S. 404, 406 (1972).  Nor is there a "general requirement that the jury reach agreement on the preliminary factual issues which underly the verdict."  *Schad v. Arizona*, 501 U.S. 624, 631-32, 645 (1991).  In the absence of clearly established Supreme Court law supporting Dunham's claim, therefore, the state court's denial of the claim cannot be contrary to, or an unreasonable application of, clearly established Supreme Court law.  28 U.S.C. § 2254(d)(1); *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

Moreover, to the extent Dunham claims the state court's denial of this claim was a violation of state law, he is not entitled to relief because federal habeas relief is not available for a state court's interpretation of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Even if Dunham could challenge the unanimity instructions on state law

grounds, the state appellate court's denial of Dunham's claim is consistent with California law. A unanimity instruction must be given in California "if the prosecution presents evidence of multiple acts to prove a single count." CALCRIM No. 3500 (2006), Bench Notes, citing *People v. Russo*, 25 Cal. 4th 1124, 1132 (2001). However, "when a charge is prosecuted under different *legal* theories, the jury need not agree unanimously on which theory applies." *People v. Grimes*, 1 Cal. 5th 698, 727 (2016):

> A unanimity instruction is required if there is evidence that more than one crime occurred, each of which could provide the basis for conviction under a single count. (*People v. Diedrich* (1982) 31 Cal.3d 263, 281, 182 Cal.Rptr. 354, 643 P.2d 971 [when evidence suggested more than one act of bribery, jury must agree unanimously which act was the basis for conviction]; see *People v. Beardslee* (1991) 53 Cal.3d 68, 92, 279 Cal.Rptr. 276, 806 P.2d 1311 ["A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses"].) But the unanimity instruction is not required " 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' "

*Id.*; *see also Russo*, 25 Cal. 4th at 1134-35 (stating that "the jury must agree on a 'particular crime' . . . [b]ut unanimity as to exactly how the crime was committed is not required.")

Dunham was charged with a specific crime in each count. The jury was instructed on the theories for each count, theft by false pretenses for counts 1, 4, 6, 9, 12, and 18, theft by embezzlement for counts 4 and 5, theft from an elder adult for counts 2, 5, 7, 10, 13, and 19, and misrepresentation or omission of a material fact in the sale of a security for counts 3, 8, 11, 14, 15, 17 and 20. (Lodgment No. 7, ECF No. 28-7 at 132-36.)[3] They were correctly told that they need not unanimously agree on the "form of theft" (the

---

[3] As the state court noted, the jury instructions erroneously listed count 4 in both the theft by false pretenses instruction and in the theft by embezzlement instruction. (Lodgment No. 7, ECF No. 28-7 at 132-34.) When the jury pointed this out, they were instructed to disregard count 4 in the false pretenses instruction. (Lodgment No. 83, ECF No. 28-83 at 50, n. 9.) In any event, the theft by false pretenses counts, counts 1, 4, 6, 9, 12, and 18, were reversed by the appellate court.

legal theory) for the theft counts and need not unanimously agree on the acts omissions committed by Dunham for the securities fraud counts. Thus, the instructions were consistent with California law. (Lodgment No. 83, ECF No. 28-83 at 53.)

Even if the unanimity instructions were erroneous, instructional error can form the basis for federal habeas corpus relief only if it is shown that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [citation omitted]." *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (citing *Cupp v. Naugh'ten*, 414 U.S. 141, 146 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The allegedly erroneous jury instructions cannot be judged in isolation, however. *Estelle*, 502 U.S. at 72. Rather, they must be considered in the context of the entire trial record and the instructions as a whole. *Id*. Dunham's claim of error in the unanimity instruction as to counts 1, 4, 6, 9, 12, and 18 (instructing the jury they need not agree on the theory of theft) is moot as the state appellate court reversed Dunham's convictions on those counts. (Lodgment No. 83, ECF No. 28-83 at 65.) As to the other theft and securities fraud counts, the jury was instructed that in order to convict Dunham of those crimes, they were required to find the elements of those crimes beyond a reasonable doubt, that each count was a separate crime that required them to consider and separately and for which they were required to return a separate verdict, and their verdicts must be unanimous. (Lodgment No. 7, ECF No. 28 -7 at 104, 148, 156.) Given the totality of the instructions, "the ailing instruction by itself [did not] so infect[] the entire trial that the resulting conviction violates due process.' [citation omitted]." *Clark*, 450 F.3d at 904.

The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Bell*, 535 U.S. at 694. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Accordingly, Dunham is not entitled to relief as to this claim.

3. *Verdicts on Timely Prosecution (Ground Two)*

In ground two, Dunham argues his federal constitutional rights were violated when the court resubmitted an ambiguous verdict on the timeliness of the prosecution to the

jury. (Pet., ECF No. 1 at 7-8, 39-42.) Respondent contends there is no clearly

established Supreme Court law which prohibits a judge from resubmitting an ambiguous

jury verdict to the jury for clarification, and, in the alternative, the state court reasonably

rejected the claim. (Answer, ECF No. 27-1 at 92-102.)

Dunham raised this claim in the petition for review he filed in the California

Supreme Court. (Lodgment No. 86, ECF No. 28-86.) That court denied the petition

without citation of authority. (Lodgment No. 87, ECF No. 28-87.) Accordingly, this

Court must "look through" to the state appellate court's denial of the claim to determine

whether it was contrary to, or an unreasonable application of, clearly established Supreme

Court law, or was based on an unreasonable determination of the facts. *Bell*, 535 U.S. at

694; 28 U.S.C. § 2254(d). That court addressed the claim as follows:

> Prior to trial, Dunham filed a motion to dismiss the case as time
> barred, contending that the named victims constructively discovered the
> crimes by February 2009, when a group of plaintiffs represented by Gaston
> initiated their civil lawsuit against Dunham. The trial court heard evidence
> on the constructive knowledge issue with regard to Beverly, Raymond, and
> Marilyne, and ruled that the counts involving them as victims were not time
> barred as a matter of law (counts 1–11). Subsequently, the People added
> counts involving the remaining victims. The court heard all of the victims'
> testimony at the preliminary hearing and denied Dunham's section 995
> motion to set aside the operative information.

> During trial, the People called the victims as witnesses to testify
> regarding the extent of their knowledge of Dunham's actions and their
> Cherokee Village investments. The People also called Gaston attorneys and
> Investigator Brown to testify about how they came to suspect Dunham's
> criminal conduct. After closing arguments, the jury was instructed regarding
> the statute of limitations. The parties agreed on the instruction, based on
> CALCRIM No. 3410, as follows:

> > "A defendant may not be convicted of Counts 1 to 20 unless the
> > prosecution began within 4 years of the date the crimes were
> > discovered or should have been discovered.

> > "In regards to Counts 1-12, the prosecution began on March 18,
> > 2013.

"In regards to Counts 13 to 20, the prosecution began on June 21, 2013.

"A crime should have been discovered when the victim was aware of facts that would have alerted a reasonably diligent person in the same circumstances to the fact that a crime may have been committed.

"The People have the burden of proving by a preponderance of the evidence that prosecution of this case began within the required time. This is a different standard of proof than proof beyond a reasonable doubt. To meet the burden of proof by a preponderance of the evidence, the People must prove that it is more likely than not that prosecution of this case began within the required time. If the People have not met this burden, you must find the defendant not guilty of the crimes alleged in Counts 1-19."

In addition, the parties agreed on the verdict forms, which required the jury to write whether Dunham was "guilty" or "not guilty" of the charged offenses. For counts 1-20, the forms called for the jury to write in the word(s) "had" or "had no" to complete the following sentence in pertinent part: "And we further find that the above offense victim of said offense or a law enforcement agency chargeable with the investigation and prosecution of said offense [Had] [Had No] actual or constructive knowledge of said offense within 4 years of the date the prosecution began . . . ." (special finding).

After deliberating, the jury found Dunham guilty and wrote in the word "had" to complete the special finding sentences for counts 1-20.

Outside of the jury's presence, the prosecutor expressed his concerns regarding the verdict forms. The prosecutor believed the jury intended to return a finding of timely prosecutions, but the wording on the verdict forms was confusing because a victim's actual or constructive knowledge of the offense within four years of the date the prosecution began could mean a timely or untimely prosecution. Defense counsel agreed there was a problem and suggested that having the jury write "had no" actual or constructive knowledge would be an unambiguous way for the jury to return a special finding of timely prosecutions if that was the jury's intention.

24

Defense counsel did not object to the court's proposed resolution of speaking to the jury and sending the jury back to further deliberate and/or clarify its special finding if necessary.

In the jury's presence, the court stated that it was "unclear to the court if the jury was finding that the prosecution was timely . . . or whether it was untimely . . . ." The prosecutor indicated that the jury needed to find that the victims "had no" actual or constructive knowledge in order to find Dunham guilty. The court clarified the prosecutor's statement by informing the jury that Dunham could be found "guilty but be outside the statute of limitations, or he can be found guilty and it's within the statute of limitations." The court's final comment to the jury was, "The way I read this [(the forms)] is that you found him guilty on all 21 counts, but you found it was outside the statute of limitations . . . [¶] . . . if that's your verdict, that's your verdict, or [clarify] if it needs to be clarified."

After further deliberations, the jury changed the verdict forms to say that the victims or law enforcement "'had no' actual or constructive knowledge of [the] said offense within 4 years of the date the prosecution began . . . ." The court then proceeded to poll each juror regarding his or her special finding. The court stated as follows: "I'm going to ask a further clarification since we had that confusion. As to the statute of limitations, was it your finding that the . . . action was filed within the statute of limitations, and that they [(the victims)] had no prior knowledge prior to that . . . ." (Italics added.) Each juror responded, "yes."

B. *Instructions and Verdict Forms*

. . . .

Dunham next argues that the verdict forms asked an irrelevant question because neither of the special finding options properly resolved the pertinent issue of whether the prosecutions began within four years of the date the crimes were discovered or should have been discovered.

We preliminarily conclude that Dunham forfeited this argument. "'Failure to object to a verdict before the discharge of a jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected.'" (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 263–264, quoting *Henrioulle v. Marin Ventures,*

*Inc.* (1978) 20 Cal.3d 512, 521; see *People v. Cleveland* (2004) 32 Cal.4th 704, 754 [failure to object to court's actions regarding verdict forms forfeits issue on appeal].) Here, defense counsel did not object to any of the proceedings related to the jury's findings on the statute of limitations, including the court's instructions and questions, prosecutor's arguments, and verdict forms. The alleged defect in the special finding options was readily apparent and discussed at length by the court and counsel. Dunham's counsel agreed with the court's suggested method of addressing the jury regarding the verdict forms and then polling the jury regarding its special finding. Dunham's claim is forfeited.

Nevertheless, we conclude the error was harmless because the jury unmistakably found the prosecutions were timely. (See *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1244 [defective special verdict form is subject to harmless error analysis].) A verdict is to be given a reasonable intendment and construed in light of the issues submitted to the jury and the instructions of the court. The form of a verdict is immaterial provided the intention to convict of the crime charged is unmistakably expressed. (*People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272.) "'[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice.'" (*People v. Jones* (1997) 58 Cal.App.4th 693, 710-711.) A general verdict of guilty as charged necessarily includes a finding that the prosecution was timely. (*People v. Allen* (1941) 47 Cal.App.2d 735, 748 (*Allen*).)

In this case, the jury was properly instructed on the statute of limitations based on CALCRIM No. 3410, which informed the jury that if the People did not meet its burden of proving timely prosecutions, the jury must find Dunham "not guilty." Had the jury written nothing on the special finding portion of the verdict form, its general guilty verdict was a sufficient finding that the prosecutions began within four years of the date the crimes were discovered or should have been discovered. No special verdict or finding was required. (*Allen*, *supra*, 47 Cal.App.2d at p. 748.)

However, since the jury was asked to make a special finding, we construe the jury's intention in light of the proceedings. The jury initially wrote that the victims or law enforcement "had" actual or constructive knowledge of the offenses within four years of when the prosecutions began, which could mean a timely prosecution if, for instance, the victim first acquired knowledge of the offense in 2011, or could mean an untimely

prosecution if a victim had knowledge of the offense by 2009. We are convinced the jury found the prosecutions timely, since it was informed that leaving the forms unchanged meant a finding that the prosecutions began "outside the statute of limitations," which the court stated was a permissible outcome, but the jury chose instead to change the verdict forms to the "had no" option, which the jury had been told would indicate a timely prosecution. When polled, the jury confirmed its special finding that the action was filed within the statute of limitations. Under the circumstances, the jury unmistakably found Dunham guilty and that the prosecutions began within the statute of limitations.

(Lodgment No. 83, ECF No. 28-83 at 28-36.)

As Respondent correctly notes, there is no clearly established Supreme Court law which holding that resubmitting an ambiguous verdict to a jury violates a defendant's due process rights. *See Drayton v. Castro*, 319 Fed. Appx. 632, 634-35 (9th Cir. 2009). The Ninth Circuit has stated that a trial judge may ask a jury to clarify its verdict when the verdict is ambiguous or inconsistent. *Skains v. California*, 386 Fed. Appx. 620, 622-23 (9th Cir. 2010). But there is also no federal constitutional right to a consistent verdict. *Ferriz v. Giurbino*, 432 F.3d 990, 992 (9th Cir. 2005); *United States v. Powell*, 469 U.S. 57, 65 (1984) (holding that the Constitution tolerates inconsistent verdicts). In the absence of clearly established Supreme Court law supporting Dunham's claim, the state court's denial of the claim is not contrary to, or an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1); *Musladin*, 549 U.S. at 77.

A trial judge may not, however, coerce a verdict from a jury. "Coercion can occur when, for example, a . . . court tells a jury that it must reach a decision, [citation omitted] a . . . court polls a jury before it reaches a verdict, [citation omitted omitted], or a special verdict form 'reformulate[s] the elements of the crime,' *United States v. Reed*, 147 F.3d 1178, 1181 (9th Cir.1998)." *United States v. McCaleb*, 552 F.3d 1053, 1057-58 (9th Cir. 2009). Whether a trial judge's inquiry amounts to coercion is to be reviewed "in its context and under the circumstances." *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988); *Parker v. Small*, 665 F.3d 1143, 1147 (9th Cir. 2011).

In Dunham's case, the record supports a conclusion that the trial judge did not

coerce the jury into a decision. When the verdicts were read, they found Dunham guilty of the charges and that the victims and/or law enforcement had actual or constructive knowledge of the offense within four years of the prosecution; the prosecutor then sought a chambers conference. (Lodgment No. 29, ECF No. 28-29 at 130-34.) It was at this point that it became clear to the court and counsel that the language in the verdict form was ambiguous and confusing because it did not determine whether the prosecution had begun within the statute of limitations. (*Id.*) At the conclusion of the discussion, the trial judge decided she would ask the jury to clarify their verdicts:

> [THE COURT]: Before we finish, the court has a question for the jury. I've had a reported sidebar with counsel. I note for the record that there is out of the 20 counts, there is a statute of limitations issue, and the way the form reads, it's unclear to the court if the jury was finding that the prosecution was timely, meaning there was not actual or constructive knowledge prior to the filing or the discovery, or whether it was untimely. Meaning that it was outside the statute of limitations. So what I'm going to do is send the jury back to the deliberation room to clarify that on the verdict form.
>
> Is that satisfactory, Mr. Jimenez?
>
> [PROSECUTOR] MR. JIMENEZ: I think the jury needs to know that they cannot find the defendant guilty of any charge if –
>
> THE COURT: If it's outside the statute of limitations.
>
> MR. JIMENEZ: If the victims had knowledge. The only way they can find the defendant guilty is if the victims had no actual or constructive knowledge.
>
> [DEFENSE COUNSEL] MR. CARLOS: You're saying the only way he can be prosecuted.
>
> THE COURT: Right. He can be found guilty but be outside the statute of limitations, or he can be found guilty and it's within the statute of limitations.
>
> MR. JIMENEZ: I think we have no jurisdiction if it's outside the statute of limitations is my understanding of the law.

THE COURT: That's not the way –

MR. JIMENEZ: I apologize for the confusion.

THE COURT: That's all we're going to say to the jury to allow them to go in and correct or leave their verdicts as they are, and that would be to everything except the perjury charge.

MR. JIMENEZ: Before we send the jury back, can the court inquire at least from the foreperson if they understand what the court just said. I'm not so sure.

THE COURT: Do you understand, foreperson?

JURY FOREPERSON: Further explanation would be beneficial for all jurors.

THE COURT: The way I read this is that you found him guilty on all 21 counts, but you found it was outside the statute of limitations.

JURY FOREPERSON: That's clear instructions.

THE COURT: If that's your verdict, that's your verdict, or if it needs to be clarified. (Recess taken.)

(Lodgment No. 29, ECF No. 28-29 at 135-36.)

The judge did not tell the jury they had to change their verdicts. Rather, she advised them that the verdicts indicated the jury had concluded the prosecution was outside the statute of limitations and that if they needed to clarify their verdicts they should do so. (*Id.*) Considering the judge's comments in their "context and under the circumstances," the state court's conclusion that the resubmission of the verdicts to the jury and the judge's comments were appropriate was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Bell*, 535 U.S. at 694. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Even if federal constitutional error did occur, Dunham has not established the error

had a substantial an injurious effect on the outcome.  *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993).  After the jury came back with their clarified verdicts, the judge polled the jurors specifically on the question of whether the prosecution was timely.  (Lodgment No. 29, ECF No. 28-29 at 139-40.)  Each juror confirmed that they found the prosecution was timely.  (*Id.*)  There is no evidence to support a conclusion that the outcome would have been different absent the alleged error.  *Brecht*, 507 U.S. at 622.

Dunham also complains about a specific error in the jury instruction associated with count 15.  (Pet., ECF No. 1 at 8, 41-42.)  The instruction incorrectly listed the date of prosecution for that count as June 21, 2013.  The correct date was December 2, 2014.  (Pet., ECF No. 8, 39-42.)  On this question, the appellate court found as follows:

> Dunham identifies a particular error in the jury instruction and verdict form for count 15, securities fraud relating to David and Joyce's investment in GCREF.  The instructions and form for count 15 listed the date prosecution began as June 21, 2013, even though count 15 was added on December 2, 2014.  We conclude that Dunham's claim has been forfeited since defense counsel agreed to the date that prosecution began.  (*People v. Simmons* (2012) 210 Cal.App.4th 778, 794 [defendant's failure to request a specific instruction regarding the date that crimes had to have been committed in order for prosecution to be timely was forfeited when information was facially sufficient]; *People v. Smith* (2002) 98 Cal.App.4th 1182, 1193 [trial court has no sua sponte duty to instruct on statute of limitations].)

> Furthermore, we conclude the error was harmless beyond a reasonable doubt.  (*People v. Bell* (1996) 45 Cal.App.4th 1030, 1065-1066.)  The jury implicitly found that David and Joyce had no actual or constructive knowledge of the offense as of June 21, 2009, four years before June 21, 2013.  Based on our review of the record and as discussed in further detail *post*, neither David nor Joyce learned of any new or additional facts between June 2009 and December 2010 that would have alerted a reasonably diligent person in the same circumstances to the fact that fraud had occurred.  Instead, the couple continued to expect that they would eventually receive a return on their investment.  Thus, there was no prejudice from the alleged instructional error.

(Lodgment No. 83, ECF No. 28-83 at 35-36.)

Errors of federal constitutional dimension are reviewed in state court under the standard of *Chapman v. California*, 386 U.S. 18 (1967), which requires a court to determine whether the error was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24. When a petitioner challenges a state court's determination under *Chapman* on federal habeas corpus review, a federal court must review the state court's harmlessness determination under AEDPA's standard:

> When a *Chapman* decision is reviewed under AEDPA, "a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." *Fry* [*v. Pliler*], supra, [551 U.S.] at 119 [citation omitted] (emphasis in original). And a state-court decision is not unreasonable if "'fairminded jurists could disagree' on [its] correctness." [*Harrington v.*] *Richter*, *supra*, [562 U.S.] at 101 [citations omitted]. [A petitioner] therefore must show that the state court's decision to reject his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." [*Richter*,] 562 U.S., at 103 [citation omitted].

*Davis v. Ayala*, 576 U.S. __, 135 S. Ct. 2187, 2199 (2015).

As the state court noted, by finding count 15 was timely prosecuted on the incorrect date of June 21, 2013, the jury necessarily concluded that David and Joyce did not have actual or constructive knowledge of the offense as of June 21, 2013, four years before June 21, 2009. From June 21, 2009 until February 2, 2013, David received tax documents from Dunham that showed his GCREF shares were worth around $90,000. (Lodgment No. 22, ECF No. 28-22 at 20-22.) David told Detective Brown that he began to think there was a problem with his investment in February of 2011. (*Id.* at 24.) He testified that in February of 2013, he still believed he had about $86,000 in his GCREF investment. (*Id.* at 25.) Based on the facts adduced at trial, the state appellate court reasonably concluded that the error in the date on the jury instructions was harmless beyond a reasonable doubt. There was sufficient evidence in the record for the jury to have concluded that David and Joyce did not have actual or constructive notice of the fraud until February of 2011. Four years from February 1, 2011 is February 1, 2015, placing the correct December 2, 2014 filing date for count 15 well within the four-year

statute of limitations.

For the forgoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Bell*, 535 U.S. at 694. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Federal habeas corpus relief is unavailable for this claim.

### 4. *Sufficiency of the Evidence (Grounds Three Through Six)*

Dunham contends in grounds three through six that the evidence supporting his convictions was insufficient for several reasons. In ground three he claims there was insufficient evidence that all twenty counts were prosecuted within the statute of limitations. In ground four he argues there was insufficient evidence presented to support his convictions for grand theft and elder theft because there was insufficient evidence of theft by false pretenses (counts 1, 2, 6, 7, 9, 10, 12, 13, 16, 18, and 19). In ground five he contends there was insufficient evidence to support his conviction for embezzlement. And in ground six he claims there was insufficient evidence supporting his conviction for securities fraud. (Pet., ECF No. 1 at 8-12, 48-63.) Respondent argues the state court's resolution of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 27-1 at 131-86.)

The Due Process Clause of the Constitution guarantees defendants the right to be convicted only upon proof of every element of a crime beyond a reasonable doubt. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (citing *In re Winship*, 397 U.S. 358, 364 (1970)). On federal habeas corpus review of a conviction on sufficiency of evidence grounds, however, a petitioner "faces a heavy burden" to establish a due process violation. *Id*. The Ninth Circuit has described a petitioner's burden as follows:

> First, he must meet the burden under *Jackson v. Virginia* of showing that "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319 [citations omitted] (1979) (Stevens, J., concurring) (emphasis in original). Second, after the passage of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), the standards of

*Jackson* are applied "with an additional layer of deference," requiring the federal court to determine "whether the decision of the [state court] reflected an 'unreasonable application of' *Jackson* . . . to the facts of this case." *Juan H.*, 408 F.3d at 1274–75; *see also Bruce v. Terhune*, 376 F.3d 950, 960 (9th Cir. 2004) (O'Scannlain, J., concurring).

*Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018).

While circumstantial evidence can be sufficient to support a conviction, "[s]peculation and conjecture cannot take the place of reasonable inferences and evidence . . . ." *Id.* at 1218; *Juan H.*, 408 F.3d at 1279; *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 2000) ("mere suspicion or speculation cannot be the basis for logical inferences"). A federal habeas court must "mindful of 'the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review.'" *Juan H.*, 408 F.3d at 1274 (quoting *Wright v. West*, 505 U.S. 277, 296-97 (1992)). Deference under AEDPA, however, "does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). In determining whether sufficient evidence has been presented, the Court refers to the elements of the crime as defined by state law. *See Jackson*, 443 U.S. at 324, n.16; *Juan H.*, 408 F.3d at 1276.

Dunham raised his sufficiency of the evidence claims in the petition for review he filed in the California Supreme Court. (Lodgment No. 86, ECF No. 27-42.) The California Supreme Court denied the petition without citation of authority. (Lodgment No. 87, ECF No. 28-87.) Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim to determine whether the denial was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Ylst*, 501 U.S. at 805-06.

a. *Sufficiency of the Evidence – Statute of Limitations (Ground Three)*

Dunham contends there was insufficient evidence presented to establish the charges against him were brought within the four-year statute of limitations. (Pet., ECF No. 1 at 8-9, 39-42.) He claims the state appellate court made unreasonable factual

determinations regarding whether the victims had constructive notice of Dunham's crimes prior to the four-year statute of limitations. The state appellate court addressed this claim as follows:

### 1. *Legal Principles*

"The statute of limitations for defendant's crimes was four years 'after discovery of the commission of the offense . . . .' (Pen. Code, § 801.5, see § 803, subd. (c).) In applying the discovery requirement, '[L]ack of actual knowledge is not required to bring the 'discovery' provision . . . into play. The crucial determination is whether law enforcement authorities or the victim had actual notice of circumstances sufficient to make them suspicious of fraud thereby leading them to make inquiries which might have revealed the fraud.' [(*Zamora*, *supra*, 18 Cal.3d at pp. 571–572.)] 'However, discovery of a loss by the victim alone is insufficient to trigger the running of the limitations period: "Literally, . . . discovery of a loss, without discovery of a criminal agency, is not enough." [Citation.]' (*People v. Soni*, *supra*, 134 Cal.App.4th at p. 1518; see *People v. Lopez* (1997) 52 Cal.App.4th 233, 246, fn. 4.) 'The question is whether there is sufficient knowledge that a crime has been committed.' (*People v. Crossman* (1989) 210 Cal.App.3d 476, 481.)" (*People v. Petronella* (2013) 218 Cal.App.4th 945, 956 (*Petronella*).)

Moreover, even when facts are sufficient to arouse suspicion in a reasonable victim, subsequent reassurances by the defendant may operate to reasonably allay concerns and delay the discovery of the fraud. (See *Garrett v. Perry* (1959) 53 Cal.2d 178, 181–182 [trial court could reasonably find that plaintiff's suspicions "were allayed by defendant's subsequent reassurances"]; *Hartong v. Partake, Inc.* (1968) 266 Cal.App.2d 942, 966 ["Even if the plaintiff discovers some suspicious circumstances, his reliance is reasonable if the defendant allays his doubts with further assurances."]; *Brownlee v. Vang* (1965) 235 Cal.App.2d 465, 476 [defendant's "[f]urther representations . . . , designed to allay the suspicions of the plaintiff, were themselves misrepresentations calculated to deceive. That they accomplished their purpose should not now redound to the benefit of the defendant."]; *Blackman v. Howes* (1947) 82 Cal.App.2d 275, 279, ["A buyer is not chargeable with knowledge of conditions which he fails to discover because of some deception of the seller. [Citations.] When . . . the buyer has only a suspicion of fraud and the seller lulls the buyer into inaction by a false representation, the seller will not be permitted to assert that the buyer lost his rights by accepting the assurance of the seller that there was no fraud.

[Citation.]"].)

. . . .

2. *The Record and Analysis*

In our view, a victim's retention of Gaston's attorneys, who alleged in a civil suit that Dunham committed fraud in promoting Cherokee Village, constituted circumstances sufficient to make the victim suspicious of fraud; a victim did not need to know specific misrepresentations that Dunham made or exactly how he committed fraud in order to trigger the running of the limitations period. Nevertheless, in this case the victims' first contacts with Gaston occurred within the limitations period, or, the victims did not contact Gaston or have notice of the lawsuit's allegations. Whether the victims could have earlier interacted with Gaston was an issue for the jury to decide.

Regarding Beverly, she knew in October 2008 that Dunham failed to pay her back on her promissory note, but at the same time, he made various offers to renegotiate the loan, including to extend the note's maturity date out for five years. Dunham blamed the real estate market for his need to repay Beverly at a later date, and the real estate market had, in fact, "crashed." Under the circumstances, a reasonable victim would not have been on notice of fraud or a crime. "[D]iscovery of a loss by the victim alone is insufficient to trigger the running of the limitations period[.]" (*People v. Soni* (2005) 134 Cal.App.4th 1510, 1518.) Although Beverly stated at trial that Dunham's failure to repay felt like a "crime to [her]," the jury could reasonably infer that she was speaking in a colloquial sense since the only fact she knew was that he was seeking to pay her later than he had initially promised. The first meeting Beverly had with Gaston was in May or June 2009, and she testified that she hired Gaston in order to get repaid. Accordingly, the initiation of Dunham's prosecution in March 2013 was timely.

Regarding Raymond, he observed seemingly low lot prices in 2006 and 2007, but was reassured by Dunham and his agents that the lot prices were actually much higher. A jury could reasonably find that Raymond was not on notice of fraud since Dunham purported to be an expert in real estate, claimed to possess special knowledge regarding the Cherokee Village real estate market, and promised to increase prices after running a marketing campaign. Based on Dunham's and Fisher's assurances, Raymond believed

that Dunham was still working on an Ed McMahon commercial. It was only through the passage of time that Raymond came to suspect Dunham had lied about the project. Raymond's first contact with Gaston was in June 2009. The initiation of Dunham's prosecution in March 2013 was timely.

Regarding Marilyne, in 2008 she had to decide whether to continue paying real estate taxes on her lots. She went online and read a few blogs, including comments by "disgruntled people," which generally indicated that Cherokee Village was a "bad investment" and that Dunham was not being truthful about the project's prospects. Given the downturn in the real estate market, Marilyne decided she had simply made a bad investment and would not keep paying taxes on her lots, effectively accepting an investment loss. She learned at some point that a group was suing Dunham, but did not want to get involved in litigation. The question before us is whether, on this record, Marilyne could be charged with knowledge of Dunham's fraud by March 2009. We think not. The jury could reasonably find that unattributed blog comments were not sufficient to put Marilyne on notice of fraud and that she reasonably declined to retain an attorney for what she believed was merely an unsuccessful investment.

Regarding James, Dunham informed him that the project was delayed by the economy and Dunham's illness. Throughout 2009, Dunham reassured James that it was only a matter of time before Dunham could return his money. For instance, in August 2009, Dunham said he might be able to repay James in 60 days. In February 2010, Dunham offered to partially repay James with lots. Meanwhile, James received annual K-1 financial statements showing the value of his investment in GCREF. Under the circumstances, the jury could find that Dunham's promises to return James's investment delayed his discovery of fraud. Likewise, contrary to Dunham's assertion on appeal, the jury could find that the PPM for GCREF would not have caused a reasonable investor to suspect fraud, since the document contained fairly boilerplate language of investment risks. James did not contact Gaston until 2010.

Herbert did not suspect anything was wrong with his investment until he heard about Dunham's Arkansas lawsuit against ALC, which did not begin until at least October 2009. Herbert viewed Dunham as his financial advisor and trusted him like a family member.

Finally, regarding David and Joyce, our review of the record persuades us that they were not on notice of fraud prior to 2011. Knowing

that the real estate market had "plummeted" in 2008, they accepted Dunham's explanations for delays and why he could not yet return the couples money in 2008 or 2009. They had no reason to suspect that their investment in GCREF was gone. Dunham told them that the market had gone down, he had been ill, he needed more time to increase property values, and things were still moving forward. David continued believing he held a substantial investment in GCREF as shown on his K-1 financial statements that Dunham sent him every year through 2012. Substantial evidence supports a finding that the couple had no reason to suspect fraud before June 2009.

However, at some point after September 2011, Dunham sent David a letter disclosing the Arkansas lawsuit against ALC and the ALC–SID contractual arrangement. At that point, with the exercise of reasonable diligence, Dunham's fraud could have been discovered. David and Joyce's constructive knowledge of fraud in 2011 would mean that Dunham was timely prosecuted in 2013 (as to counts 13-14) and 2014 (as to count 15).

In summary, substantial evidence supports the jury's implied finding that a reasonably prudent person in each of the victim's positions would not, with the exercise of reasonable diligence, have discovered that he or she was the victim of fraud by March or June 2009. Counts 1-20 were not barred by the statute of limitations.

(Lodgment No. 83, ECF No. 28-83 at 36-41.)

"The Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged." *United States v. Gaudin*, 515 U.S. 506, 511 (1995). The standard of proof the prosecution must meet and a jury must apply is proof beyond a reasonable doubt. *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993). In California, however, the statute of limitations is not an element of the offense and it need only be proven by a preponderance of the evidence. *People v. Meza*, 198 Cal. App. 4th 468, 476 (2011). "Although the right to maintain the action is an essential part of the final power to pronounce judgment, that right 'constitutes no part of the crime itself.'" *Id.*, quoting *People v. Linder*, 139 Cal. App. 4th 75, 84-85 (2006). This Court must defer to California's definition of the elements of the crime. *Jackson*, 443 U.S. at 324, n. 16; *Juan H.*, 408 F.3d at 1276. Because the statute of limitations is

not an element of the crimes of which Dunham was convicted, Dunham's claim does not warrant federal habeas relief unless the state court's construction of the law is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation," *Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir. 1989), or is "so arbitrary and capricious as to constitute an independent due process . . . violation." *Richmond v. Lewis*, 506 U.S. 40, 50 (1992) quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). There is no evidence in the record to support such a conclusion. Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Bell*, 535 U.S. at 694. It was also not based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Dunham is not entitled to relief as to this claim.

   b. *Sufficiency of the Evidence – Grand Theft, Elder Theft, Embezzlement and Securities Fraud (Grounds Four, Five and Six)*

   In ground four, Dunham argues there was insufficient evidence presented to support his convictions for grand theft in counts 1, 6, 9, 12, 16 and 18, and elder theft in counts 2, 7, 10, 13 and 19, embezzlement in count 5, and securities fraud in counts 3, 8, 11, 14, 15, 17, and 20. (Pet., ECF No. 1 at 8-12, 48-63.) On direct appeal, the state appellate court reversed the grand theft counts 1, 6, 9, 12, and 18, and thus this Court need not address those counts. (*See* Lodgment No. 83, ECF No. 28-83 at 65.) As to the elder theft, embezzlement and securities fraud counts, the state appellate court addressed the claims as follows:

   > Dunham's convictions for elder theft, grand theft as to James and Allison, and securities fraud are supported by sufficient evidence. The jury could have found that Dunham made a number or false promises or misleading statements in light of the information he knew. Numerous witnesses testified regarding essentially the same story, mutually corroborating each other's testimony. Dunham, either explicitly or implicitly and directly or through his agents, represented to the Fisher-referred victims that he was inordinately experienced and qualified to manage the proposed real estate investment project. In reality, he had spent 90 percent of his adult career selling insurance, had never owned a Wall

Street brokerage firm, had not been involved in thousands of real estate transactions, and did not have a family background in real estate. Substantial evidence supports that Dunham misrepresented his qualifications.

Further, Dunham, either explicitly or implicitly and directly through his agents, represented to the victims that he was able to increase property values after running a marketing campaign, based on controlling a sufficiently large number of Cherokee Village lots. The jury could find that such a representation was false and/or misleading in light of Dunham's knowledge that he did not control SID's inventory of lots. Dunham knew he did not possess the ability to increase Cherokee Village lot values in the manner that he led the victims to believe he did. He had an obligation to disclose ALC's exclusive right to market delinquent lots in order to make other representations he made to the victims not misleading. (E.g., *Rogers v. Warden* (1942) 20 Cal.2d 286, 289 ["the rule has long been settled in this state that although one may be under no duty to speak as to a matter, 'if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly was he tells, but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all, he must make a full and fair disclosure'"].)

This case is comparable to that of *People v. Gordon* (1945) 71 Cal.App.2d 606, 612, 613, in which the defendants engaged in a fraudulent scheme reselling desert lands to unsophisticated and elderly investors based on representing that the land could be drilled for oil and sold/leased to major oil companies at great profit. (*Id.* at p. 612.) In reality, oil companies rarely drilled for oil on any lands they acquired in the area and had only ever acquired land at nominal prices. (*Id.* at pp. 621-622.) Defendants failed to disclose the true nature and value of the subdivided land. (*Id.* at pp. 613-618.) Similarly, Dunham promised the victims that he would be able to sell their lots for a significant profit, while failing to disclose that ALC held the right to sell thousands of lots for much lower prices. Also like in *People v. Gordon*, the victims were under the false impression that Dunham was exceptionally qualified in valuing real estate. (See *id.* at p. 623 [defendants "asserted a superior knowledge of the lands and rare opportunities to acquire them not available to others"].)

Dunham's specific intent to defraud could be inferred from his own statements and a number of surrounding circumstances, including his knowledge of and failure to disclose the ALC-SID arrangement and

availability of lots on eBay; his failure to return some portion of investors' money when he had the opportunity to do so; his failure to inform investors when Ed McMahon disassociated from the project; Dunham's instructing his administrative assistant to falsify signatures on documentation; his arbitrary setting of the lots' value; his diversion of victims' assets for personal use; the elaborate manner in which he concealed assets; and, as we will discuss, Dunham's conduct in other investment schemes.

Moreover, the People established the elements of reliance (false pretenses) and materiality (securities fraud). All the victims referred to Dunham by Fisher and Martin relied to a great extent on their referrers' advice, who in turn relied on Dunham's representations. Dunham interacted directly with victim Herbert. Based on Fisher's, Martin's, Herbert's, and other victims' testimony, the jury could reasonably find that Dunham's false and misleading representations "materially influenced" the victims to invest their money with him. (*Miller*, *supra*, 81 Cal.App.4th at p. 1440.) The victims were not in a position to assess the project's viability on their own, and none of them decided to invest based solely on their own assessments. Additionally, various witnesses testified that (1) a manager's qualifications and experience are important to the success of any real estate development project; and (2) control over a significant portion of Cherokee Village lots was critical to the success of Dunham's venture. On this record, the jury could find that Dunham's qualifications and the ALC-SID contractual arrangement (including ALC's exclusive right to sell thousands of delinquent lots) were important facts to a reasonable investor in considering whether to invest.

As to Beverly's promissory note, sufficient evidence supports Dunham's conviction for grand theft by embezzlement. Beverly's age, inexperience, and circumstances made her vulnerable. Dunham effectively became her financial advisor, likening her to "family." Beverly trusted him because Fisher trusted him. She took out a home equity loan and gave $350,000 to Dunham because he reassured her that she would obtain a tax benefit, he would invest it in GCREF, and she would profit in two years' time. Instead, Dunham used the money to pay for his personal expenses. He took elaborate measures to conceal his assets and appear insolvent. The jury's verdict was supported by substantial evidence. (See *Fenderson*, *supra*, 188 Cal.App.4th at p. 641 [elderly victim's caregiver who exceeded her authority and withdrew $300,000 from victim's bank accounts for caregiver's own use was guilty of embezzlement].)

For the same reasons we have already discussed, sufficient evidence also supports Dunham's convictions for securities fraud. On appeal, Dunham principally contends the Cherokee Village "lots" did not qualify as securities under the Corporations Code. As to interests in GCREF, Dunham acknowledges that they were securities and mainly argues that statements to GCREF investors were not misleading when considered with the PPM's disclosures.

A transaction is an investment contract, and therefore a security, if it satisfies the "federal test" described in *SEC v. W.J. Howey Co.* (1946) 328 U.S. 293, 298-299 (*Howey*). (*Consolidated Management Group, LLC v. Department of Corporations* (2008) 162 Cal.App.4th 598, 610.) "Under the federal test, an investment contract consists of an investment of money in a common enterprise with the expectation of profits produced by the efforts of others." (*Reiswig v. Department of Corporations for State of California* (2006) 144 Cal.App.4th 327, 335.) The test disregards form for substance and focuses on economic reality. (*Ibid.*)

In *Howey*, the Supreme Court analyzed certain land transactions and discussed that they were investment contracts. (*Howey*, *supra*, 328 U.S. at pp. 299-300.) The court noted that the investors, who resided in distant localities and lacked proper experience or the desire to develop the land themselves, were offered "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents." (*Ibid.*) The court further discussed the unfeasibility of individual development and the investors' reliance on "respondents or third parties with adequate personnel and equipment . . . to achieve their paramount aim of a return on their investment." (*Id.* at p. 300.) The land sales contracts and warranty deeds served as a convenient way to determine the investors' "respective shares in this enterprise." (*Ibid.*)

Here, like in *Howey*, Dunham offered investors an opportunity to contribute money and to share in the profits of a Cherokee Village retirement community, which would be managed, sold, and partly owned by Dunham. The lots represented the victims' "shares in [the] enterprise." (*Howey*, *supra*, 328 U.S. at p. 300.) None of the California victims had any ability to develop homes in Arkansas, and they expected "Dunham and company" to sell their lots for them. The victims were relying on Dunham to bring professional management, homebuilding, and financing experience to the project. They had no desire to live in Arkansas themselves, except possibly Marilyne who would consider it after first realizing a profit. The

18cv0863 GPC (LL)

victims sought a return on their investment, and a profitable retirement community required a certain volume of lots to succeed. On a [sic] whole, and considering the purpose of our securities laws to protect the public from fraudulent investment schemes, the Cherokee Village lot transactions qualified as investment contracts.

Regarding Dunham's sales of interests in GCREF, the jury necessarily found that the PPM and related documentation did not adequately negate misleading oral statements made to David and James. Substantial evidence supports the jury's finding. Assuming the victims read the PPM in full, many of the disclosures were boilerplate and did not inform investors that ALC possessed the exclusive right to market delinquent lots or any implications from the ALC-SID contractual arrangement. The jury reasonably found that Dunham made materially misleading statements to the investors in GCREF, which were not corrected or clarified by the PPM.

Dunham points out that David and Joyce visited Cherokee Village and attended Dunham's seminars before converting their lots into GCREF shares and that James and Allison represented themselves as accredited investors, i.e., possessing a net worth of over $1 million. Regardless, none of the victims learned of ALC's contractual arrangement with the SID by visiting Cherokee Village or by attending Dunham's seminars. Those events did not contradict what victims had been told. In addition, an offeror/seller of securities may not make false statements in connection with the offer of a security regardless of whether an investor is accredited. (Corp. Code § 25401; 17 C.F.R. § 230.500 [transactions exempt from registration requirements but not antifraud or state securities laws].)

In summary, substantial evidence supports Dunham's convictions for elder theft, one count of grand theft as to James and Allison, and securities fraud (counts 2, 3, 5, 7, 8, 10, 11, 13, 14, 15, 16, 17, 19, & 20.)

(Lodgment No. 83, ECF No. 28-83 at 22-28.)

    i.    *Elder Theft and Grand Theft by False Pretenses (Ground Four)*

In California, theft by false pretenses requires the prosecution to establish: "(1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation." *People v. Williams*, 57 Cal. 4th 776, 787 (2013) (quoting *People v. Wooten*, 44 Cal. App. 4th 1834, 1842 (1996) (internal

quotation marks omitted)).  Dunham claims there was insufficient evidence presented to support his convictions for elder theft and grand theft by false pretenses because his statements about his real estate expertise, his connections to Wall St., his claim that he learned real estate from his family's business, and the value of the Cherokee Village lots were not "intentional, relied-upon misrepresentations," nor was his failure to disclose ALC's involvement in Cherokee Village a material misrepresentation.  (Pet., ECF No. 1 at 9-10, 52-60.)

*Background Facts*

Dunham became interested in Cherokee Village in about 2004.  (Lodgment No. 13, ECF No. 28-13 at 84.)  He traveled to Arkansas and met with Ron Rhodes of American Land Company (ALC), the entity selling lots in Cherokee Village.  (*Id.* at 50.)  ALC was marketing lots that had been repossessed for failing to pay property taxes and splitting the proceeds with the Suburban Improvement District (SID) for Cherokee Village.  (*Id.* at 50-51.)  The SID was the entity responsible for maintaining the amenities at Cherokee Village.  (*Id.* at 45.)  ALC would get 95% of the lot proceeds and the SID would get 5%.  (*Id.* at 51.)  ALC sold Cherokee Village lots on eBay and on its website.  (*Id*. at 63-64.)

Dunham became a dealer for ALC in 2004 and sought to purchase 1,000 lots; there were 8,500 lots available at the time.  (*Id.* at 89-90, 98.)  Dunham wanted ALC to agree to give him the exclusive rights to sell SID lots, to stop marketing lots on eBay and to enter into to a non-compete agreement.  (*Id.* at 106-09.)  He also wanted ALC to agree on a minimum price for lots.  (Lodgment No. 16, ECF No. 28-16 at 21.)  ALC refused to agree to any of Dunham's requests.  (*Id.*)  Dunham's plan was to control all of the available lots in Cherokee Village and then build a real estate development of homes which would increase the value of the lots.  (*Id.* at 122-23.)  Despite his failure to obtain ALC's agreement to the conditions that would make his plan possible, Dunham began marketing his plan for Cherokee Village.  (*Id.* at 22-23, 123-24.)  ALC continued to sell Cherokee Village lots on eBay for substantially less than Dunham was selling his lots. (*Id.* at 127.)

Doug Fisher and Purvey Martin were paid agents of Dunham. (Lodgment No. 17, ECF No. 28-17 at 59-60; Lodgment No. 18, ECF No. 28-28 at 201-02.) Doug Fisher met Dunham in 2005 at a presentation Dunham was giving to a group of insurance agents. (Lodgment No. 17, ECF No. 28-17 at 7.) Fisher learned from others at the presentation that Dunham had "invested his entire life in real estate," and Dunham told Fisher he learned the real estate business from his father beginning when he was a child. (*Id.* at 10, 19.) Dunham impressed Fisher with his Newport Beach office and beachfront home in Laguna Beach that Dunham said was worth $14 million. (*Id.* at 14, 21.) Dunham also told Fisher that he owned a brokerage firm on Wall St. and that he had done 4,000 real estate deals. (*Id.* at 22-23.)

Dunham told Fisher about the Cherokee Village lots, explaining that they were a good investment and would go up in price significantly over time. Fisher believed Dunham because of the successful real estate and brokerage background he thought Dunham had. (*Id.* at 10-11.) Fisher bought 10 lots for $4,000 each in January of 2005. (*Id.* at 14.) At some point, Dunham told Fisher his investment had grown by 90% and that the lots were now worth $7,500. (*Id.* at 26.) Later in 2005, Dunham told Fisher that he and his "crew" planned to build 650 homes on the lots and, after a marketing campaign featuring Ed McMahon ran, the lots would be sold for $15,000 each. (*Id.* at 39.) Fisher then bought an additional 44 lots for $7,500 each. (*Id.* at 37.) Fisher did not know about ALC or Dunham's attempts to get ALC to agree to set a price for the lots, to stop selling lots on eBay or a non-competition agreement. (*Id.* at 47-56.)

Martin was also an insurance agent who met Dunham at an investment seminar. (Lodgment No. 18, ECF No. 28-18 at 193.) At some point, Dunham told Martin about Cherokee Village and that there was "a lot of promise from investing [Cherokee Village] lots" because he "could get the lots at such a low price and that he was going to put together a plan whereby we would be able to get the land to appreciate in a good amount of time." (*Id.* at 195.) Martin attended a seminar put on by Dunham which was designed to sell Cherokee Village lots. (*Id.* at 195-96). Martin also heard Dunham's plan to have

Ed McMahon shoot a commercial promoting Cherokee Village as a retirement destination which Dunham said would drive the property values up.  (*Id.* at 195-98.)  Martin bought four lots for $3,000 each.  (*Id.* at 199.)  Martin did not know about ALC or Dunham's attempts to get ALC to agree to set a price for the lots, to stop selling lots on eBay or a non-competition agreement, and he would not have bought the lots or recommended them to his friends had he known.  (*Id.* at 211-15.)

*False Pretense or Representation to the Owner of the Property*

"[A] false pretense may consist in any act, word, symbol, or token calculated and intended to deceive.  It may be either express or implied from words or conduct."  *People v. Randono*, 32 Cal. App. 3d 164, 174 (1973) (citing *People v. Brady*, 275 Cal. App. 2d 984, 996 (1969)).  "The circumstances connected with the transaction, the entire conduct of the defendant, and his declarations to other persons may be looked to . . . for the requisite, corroborative evidence that the false pretense was made, if the conviction rests primarily on the testimony of a single witness.  *People v. Hartley*, 248 Cal. App. 4th 620, 627 (2016) (quoting *People v. Miller*, 81 Cal.App.4th 1427, 1441 (2000) (internal quotation marks omitted).  "A single false material representation is sufficient to constitute the offense of obtaining property by false pretenses."  *People v. Schmitt*, 155 Cal. App. 2d 87, 108 (1957) (citing 12 Cal. Jur. 469-470 and *People v. Cravens*, 79 Cal. App. 2d 658, 664 (1947)).

Fisher began giving financial advice to Beverly D. in 2005.  He told her he knew Dunham well and that Dunham was a "big investor [who] bought and sold lots of properties" and that Dunham had been "very successful."  (Lodgment No. 20, ECF No. 28-20 at 152, 154.)  Fisher also told Beverly D. that Dunham "was building this big area of homes, beautiful lots," and that Beverly D. could "get in on the ground floor at a reasonable price for these lots, and I would only have to keep them for a year."  (*Id.* at 153.)  Beverly D. was told she would make "several thousand dollars more than [she] paid."  (*Id.* at 164.)

Raymond M. met Fisher in 2006 at a "financial meeting."  (Lodgment No. 21, ECF

18cv0863 GPC (LL)

No. 28-21 at 73.)  Fisher told Raymond M. about the Cherokee Village project at the end of 2005 or beginning of 2006.  (*Id*. at 75.)  Fisher told Raymond M. that Dunham was in charge of the project and Dunham was "very smart, made a lot of money, and had a beautiful house worth [$12 million]."  (*Id*. at 76.)  Fisher was very excited about the project and told Raymond M. that he had bought lots in the project as well.  (*Id*.)  The project was going to be "like a resort area" and that "it would double in price in one year."  (*Id*.)  The lots were priced at $7,500 each and could be sold in a year for $15,000.  (*Id*. at 77.)  The lots would be sold by Dunham as part of the project.  (*Id*. at 77-78.)  Because he did not know, Fisher did not tell Raymond and Caroline M. that ALC was selling lots on eBay for whatever price they could get, that ALC had refused to agree to a non-compete agreement with Dunham, or that ALC had refused to agree to a sales price for the lots.  (*Id*. at 106-07.)

Jay and Marilyne A. met Fisher when he sold them an annuity.  (Lodgment No. 21, ECF No. 28-21 at 7.)  In 2005 or 2006, Fisher suggested they invest in Cherokee Village.  (*Id*. at 7-8.)  Fisher told them it was a good investment and that he would sell them for a profit for them in the next five to ten years.  (*Id*. at 9-10.)  Fisher described the development that would be built on the lots as a retirement destination.  (*Id*. at 12-13.)  Fisher told them Ed McMahon was going to star in a commercial for the project and that McMahon had already built a home there.  (*Id*. at 13.)  Fisher also told them Dunham was in charge of the project and that Dunham was "very well-versed in this type of real estate" and the he had done these types of projects before.  (*Id*. at 18-19.)  Jay and Marilyne A. were never told about ALC, their relationship to the SID, that the ALC was selling Cherokee Village lots on eBay, and that Dunham had tried and failed to secure an agreement with ALC to set a minimum price for the lots, stop selling lots on eBay and not compete with Dunham.  (*Id*. at 36-37.)

David and Joyce M. and Martin were friends.  (Lodgment No. 21, ECF No. 28-21 at 169.)  Sometime in 2005, Martin told David and Joyce M. about Cherokee Village and that the man in charge, Dunham, was a "genius in real estate," that he "always had made

money" and had "lived in the east and sold and made money there." (*Id*. at 170.) Martin suggested they invest in Cherokee Village and David and Joyce M. met with Dunham to discuss the purchase. (*Id*. at 171.) Dunham told them they were buying the lots at or below market price and that he would be able to market the properties and "bring some money back." (*Id*. at 196.) Dunham told David and Joyce M. that the market for the lots was going to increase and eventually [they] could sell them for a profit." (*Id*. at 197.) No one told David and Joyce M. about ALC, their relationship to the SID, that the ALC was selling Cherokee Village lots on eBay, and that Dunham had tried and failed to secure an agreement with ALC to set a minimum price for the lots, stop selling lots on eBay and not compete with Dunham. (Lodgment No. 22, ECF No. 28-22 at 32-22.)

James W. knew Martin from church and had profitably invested with him once. (Lodgment No. 23, ECF No. 28-23 at 148-50.) Martin told James W. about Cherokee Village sometime in 2006. (*Id*. at 153.) Martin suggested James W. invest in Cherokee Village through Gold Coast Real Estate Fund (GCREF). Martin told James W. GCREF had purchased 1,000 lots at under value prices and that they were going to develop the property and increase the lots' value. (*Id*. at 158.) They planned to build homes on 100 lots which would make adjoining lots more valuable. (*Id*. at 159.) Martin also told James W. GCREF had raised $10 million dollars. (*Id*. at 158.) James W. was told he would get a 10% return on his investment. (*Id*. at 161.) Martin told James W. that he would be working with Dunham on GCREF, that Dunham had been in real estate his whole life and had "done very well for himself" and his clients and that he and Dunham had done multiple real estate deals together. (*Id*. at 163.) Webb understood that he did not own Cherokee Village lots but rather an interest in GCREF which owned the lots. (*Id*. at 164.) James W. invested in GCREF because he believed it would provide enough income to support him and his wife while they built churches in New Zealand. (*Id*. at 161.) Because he did not know himself, Martin did not tell James W. about ALC, their relationship to the SID, that the ALC was selling Cherokee Village lots on eBay, and that Dunham had tried and failed to secure an agreement with ALC to set a minimum price

for the lots, stop selling lots on eBay and not compete with Dunham. (Lodgment No. 24, ECF No. 28-24 at 64-66.)

Herbert T. met Dunham in the late 70's or early 80's. (Lodgment No. 20, ECF No. 28-20 at 9.) He invested with Dunham several times. In 2004, Dunham told Herbert T. about Cherokee Village. (*Id*. at 23, 29.) Dunham told Herbert T. he had exclusive rights to the lots in Cherokee Village, that Ed McMahon was going to be a spokesperson for the project, that he was going to build "state of the art eco-friendly houses [and] a large retirement community," and the value of the property would therefore increase significantly. (*Id*. at 23-24.) Herbert T. was never told about ALC, that ALC had access to continuous supply of foreclosed lots they could sell, that ALC was selling Cherokee Village lots on eBay, and that Dunham had tried and failed to secure an exclusive marketing agreement, a non-competition agreement, and an agreement with ALC to set a minimum price for the lots. (*Id.* at 52-56.)

Viewing the evidence in the light most favorable to the prosecution, as required under *Jackson*, a rational jury could conclude from this evidence that Dunham, personally and through his agents Fisher and Martin, made false pretenses and representations to Beverly D., Ray and Caroline M., Jay and Marilyne A., David and Joyce M., the James and Allison W. and Herbert T. *Maquiz*, 907 F.3d at 1217. Contrary to what Dunham told Fisher, Martin and the victims, he was not a wildly successful real estate investor. At the civil deposition he sat for as part of the civil case against him, which was introduced at trial, Dunham testified that he had previously invested only twice before in the purchase of blocks of real estate, and that he had spent 90% of his time in the preceding 30 years working in insurance. (Lodgment No. 13, ECF No. 28-13 [CD of Dunham's civil deposition]. In addition, Fisher and Martin falsely told Beverly D., Raymond M. and David and Joyce M. that they were purchasing the lots at or below market price. Beverly D. purchased her lots for $7,600. (Lodgment No. 20, ECF No. 28-20 at 163-64.) Raymond M. purchased his lots for $7,500. (Lodgment No. 21, ECF No. 28-21 at 77-78.) David and Joyce M. bought 13 lots for $50,000 for an average of $3,800 per lot.

(Lodgment No. 21, ECF No. 28-21 at 196.)  According to Cherokee Village real estate agent Ron Rhodes, from 2002 until 2008 Cherokee Village lots were selling for between $3,000 and $3,500.  (Lodgment No. 13, ECF No. 28-13 at 68.)  Moreover, Dunham knew that he could not generate a return on his victims' investments within a year, as he told Duncan, Moore, and Webb and that he could not make his plan to increase the value of the lots by developing Cherokee Village into a retirement home destination, as he told Beverly D.,  Raymond and Caroline M., Jay and Marilyne A., David and Joyce M., James and Allison W. and Herbert T., if he could not control the price of the lots.  And he knew he could not control the price because ALC could undercut him at any time.  ALC had a continuous supply of lots they were selling on eBay and he had tried and failed to secure a price guarantee, a non-competition agreement and an exclusive marketing agreement for the lots with ALC.  (Lodgment No. 18, ECF No. 28-18 at 209, 212-13.)

*Intent to Defraud*

"The intent to defraud is a question of fact, to be determined from all the facts and circumstances of the case."  *People v. Frankfort*, 114 Cal. App. 2d 680, 697 (1954).  A defendant's intent to defraud the owner may be established by circumstantial evidence but must be more than simple non-performance of a promise.  *Hartley*, 248 Cal. App. 4th at 627 (2016) (citing *People v. Ashley*, 42 Cal. 2d 246, 264 (1954)).

Dunham falsely told his agents Fisher and Martin he had a brokerage on Wall St. and was a successful real estate developer who had done over 4,000 real estate deals. This induced Fisher and Martin to buy Cherokee Village lots themselves, and then market them to the victims.  A rational jury could conclude Dunham wanted Fisher and Martin to pass the false information he had told them on to the victims in order to entice them to invest in Cherokee Village. Through Fisher and Martin, Dunham told the victims he could increase the value of their lots by successfully developing a retirement destination while knowing ALC continued to sell Cherokee Village lots on eBay and that he did not have a non-competition agreement, minimum price agreement, or exclusive marketing deal with ALC.  Dunham specifically told Herbert T. that he had exclusive rights to

market Cherokee Village lots. A rational jury could conclude Dunham did so because he intended to defraud the victims of their money.

In addition, testimony at trial established that Fisher, Martin and Dunham told the victims that Ed McMahon was going to star in a nationwide commercial to market the project. (Lodgment No. 18, ECF No. 28-18 at 207.) Testimony from Ed McMahon's son, however, established that Dunham resisted paying the $800,000 required for the nationwide marketing campaign that would go along with the McMahon commercial. (Lodgment No. 23, ECF No. 28-23 at 85-88.) A rational jury could conclude from this evidence that Dunham never intended to spend the money necessary for a nationwide marketing campaign and falsely represented McMahon's involvement in the Cherokee Village project in order to induce investors to invest in the Cherokee Village project and defraud them of their money. Moreover, an auditor from the California Department of Business Oversight, Lisa Medina, testified about Dunham's use of shell corporations to shuttle money to his personal accounts and hide it from the victims. Medina testified that the money from Duncan, the Moores and the Ayers was deposited into an account titled "The Ronald D. Dunham Trust," and Dunham paid personal expenses from that account. (Lodgment No. 26, ECF No. 28-26 at 10-13.) Dunham claimed at trial the reason Cherokee Village failed was because of the 2008 recession. On October 24, 2008, however, the Dunham trust account held $1,924,602.38, and none of that money was returned to investors. (*Id*. at 12.) This is additional evidence of Dunham's intent to defraud.

*Reliance*

While "the false pretense or representation must have materially influenced the owner to part with his property, . . . [it] need not be the sole inducing cause." *People v. Ashley*, 42 Cal. 2d 246, 259 (1954). Moreover, "the express testimony of a victim of false pretense that he was induced to part with his money by the fraudulent statements of the accused is not essential. It is sufficient if the inference of his reliance could have been drawn from all the evidence." *Frankfort*, 114 Cal. App. 2d at 699 (quoting *People*

*v. Gordon*, 71 Cal. App. 2d 606, 624 (1945)).

When asked whether she would have still purchased the Cherokee Village lots had she known these facts, Beverly D. testified that she could not answer the question. (Lodgment No. 20, ECF No. 28-20 at 168.) However, Beverly D. also testified that she invested in Cherokee Village because she trusted Fisher and because she was impressed by the wealth and experience Fisher told her Dunham had. (*Id.* at 156, 158-59, 168.) Viewing the evidence in a light most favorable to the prosecution, a rational jury could conclude that Beverly D. "transferred the property in reliance on [Dunham's false] representation." *Williams*, 57 Cal. 4th at 787; *see also Ashley*, 42 Cal. 2d at 264.

A rational jury could also conclude that Raymond and Caroline M. transferred their property to Dunham in reliance on his misrepresentations. Raymond M. testified that "[n]ormally I did not do anything like this, never took chances, never went out of my comfort zone, because we never really had very much, so money was very important to us." (Lodgment No. 21, ECF No. 28-21 at 74.) He was looking for an investment that made money because he and his wife were supporting their mothers who were in senior citizen facilities. (*Id.*) Specifically, Raymond M. testified that Fisher had offered them a different investment prior to Cherokee Village and they had turned it down because they needed a quicker turnaround on their investment. (*Id.* at 75.) Thus, a rational jury could conclude that Dunham's false promise that Cherokee Village lots would double in value in a year was one of the main reasons Raymond and Caroline M. invested.

Marilyne A. testified that if she had known about ALC's activities at Cherokee Village, she would not have invested in the project. (Lodgment No. 21, ECF No. 28-21 at 36-38.) There was also sufficient evidence for a rational jury to conclude that David and Joyce M. and James and Allison W. relied on Dunham's and Martin's representations of the viability of Cherokee Village as a successful investment. David M. testified that he probably would not have invested in Cherokee Village had he known about ALC. (Lodgment No. 22, ECF NO. 28-22 at 35.) Joyce M. testified they were investing the money in Cherokee Village as a means to generate income for their "old age," and the

18cv0863 GPC (LL)

jury could have found that David and Joyce M. would not have invested in Cherokee

Village if it had been portrayed as the risky investment it was. (Lodgment No. 21, ECF

No. 28-21 at 170.) James W. testified he invested in GCREF in order to generate enough

income to live on while he and his wife built churches for charity and that he would

likely not have invested in GCREF if he had known about ALC. (Lodgment No. 23, ECF

No. 28-23 at 61; Lodgment No. 24, ECF No. 28-24 at 65-66.) Finally, Herbert T.

testified he would not have invested in Cherokee Village had he known ALC was selling

lots on eBay and had access to thousands of foreclosed lots. (Lodgment No. 18, ECF No.

28-28 at 213.)

In sum, the California appellate court's conclusion that there was sufficient

evidence to support Dunham's elder theft convictions was neither contrary to, nor an

unreasonable application of, clearly established Supreme Court law. *Bell*, 535 U.S. at

694. Nor was it based on an unreasonable determination of the facts. 28 U.S.C.

§ 2254(d)(2). Dunham is not entitled to relief as to this claim.

ii.     *Embezzlement (Ground Five)*

"The elements of embezzlement are '1. An owner entrusted his/her property to the

defendant; 2. The owner did so because he/she trusted the defendant; 3. The defendant

fraudulently converted that property for his/her own benefit; [and] 4. When the defendant

converted the property, he/she intended to deprive the owner of its use.'" *People v.

Fenderson*, 188 Cal. App. 4th 625, 636-37 (2010). "The offense of embezzlement

contemplates a principal's entrustment of property to an agent for certain purposes and

the agent's breach of that trust by acting outside his authority in his use of the property."

*People v. Sisuphan*, 181 Cal. App. 4th 800, 813-14 (2010). "If the relation is that of

creditor and debtor merely, an appropriation by the latter does not constitute

embezzlement." *People v. Wooten*, 44 Cal. App. 4th 1834, 1845 (1996) (quoting *People

v. Petrin*, 122 Cal. App. 2d 578, 581 (1954) (internal quotation marks omitted)). Dunham

contends there was insufficient evidence establishing a relationship of trust between he

and Duncan and that because Duncan did not explicitly limit his use of the funds, he

could not have misused them by using them for personal expenses. (Pet., ECF No. 1 at 10-11, 60-63.)

Dunham had convinced Fisher he was an extremely successful real estate businessman and Fisher trusted Dunham enough to invest in Cherokee Village lots. (Lodgment No. 17, ECF No. 28-17 at 10-37.) Fisher in turn convinced Duncan to trust Dunham by telling her that he "was very impressed with what Mr. Dunham was doing," and that Dunham was "a big investor and he bought and sold lots of properties." (Lodgment No. 20, ECF No. 28-20 at 154-56.) According to Fisher, Dunham had made "investments . . . with big properties and that he had been very successful in real estate. (*Id.*) After Fisher had convinced Duncan to purchase Cherokee Village lots, Fisher took Duncan to meet with Dunham at his impressive Newport Beach office. (*Id.* at 169.) At the meeting, Dunham convinced Duncan to trust him by appearing to be looking out for her interests. He told her she needed more tax deductions and that she could get some by taking money out of her house. (*Id.* at 170.) Dunham suggested she take out a $350,000 mortgage on her home, but Duncan was "a little overwhelmed" by Dunham's suggestion and "hemmed and hawed a while." (*Id.*) Dunham further encouraged Duncan's trust by writing down the value of all her assets, including her home, car, furnishings, household goods, and by telling her she was worth "a million dollars" and could afford the $350,000 mortgage. (*Id.* at 170, 172.) Duncan eventually agreed, obtained the $350,000 mortgage, gave the money to Dunham to invest, and signed a 2-year promissory note for the money that listed a 12% interest rate. (*Id.* at 173-75.) Viewing the evidence in a light most favorable to the prosecution, as this Court is required to do under *Jackson*, a rational jury could conclude that Duncan took out a $350,000 mortgage on her home and gave the money to Dunham to invest because she trusted him with her money.

Dunham also argues there was insufficient evidence he fraudulently converted Duncan's property to his own use because Duncan did not explicitly limit his use of the funds. (Pet., ECF No. 1 at 60-63.) Duncan testified she gave the money to Dunham to invest in Gold Coast Real Estate and other investments which would generate a  profit

within two years. (Lodgment No. 20, ECF No. 28-20 at 176, 182.) The evidence established, however, that Dunham used Duncan's money for his own personal expenses. Lisa Medina, the auditor from the California Department of Business Oversight, testified that on October 24, 2006, $350,000 from Duncan was deposited into the Ronald D. Dunham Trust account. (Lodgment No. 26, ECF No. 28-26 at 11.) Dunham used that account to pay mortgage payments, alimony, child support and taxes. (*Id.* at 10.) In 2008, Medina testified Dunham had access to bank accounts worth over $1.9 million dollars. (*Id.* at 12.) When Duncan asked Dunham to repay the note in 2008, however, he said he did not have the money. (*Id.* at 178.) A rational jury could conclude from this evidence that Dunham fraudulently converted Duncan's investment money to his own personal use.

       iii.    *Securities Fraud (Ground Six)*

     Dunham also contends the evidence was insufficient to support his convictions on the securities fraud counts that involved the Cherokee Village lots because the lots were not "securities" and because there was insufficient evidence to establish he made material misrepresentations or omissions. (Pet., ECF No. 1 at 11-12, 48-52.) Respondent contends the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 27-1 at 172-86.)

     Dunham raised this claim in the petition for review he filed in the California Supreme Court. (Lodgment No. 86, ECF No. 27-42.) The California Supreme Court denied the petition without citation of authority. (Lodgment No. 87, ECF No. 28-87.) Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim to determine whether the denial was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Ylst*, 501 U.S. at 805-06. That court analyzed the claim as follows:

          Corporations Code sections 25401 and 25540 criminalize the sale of securities by means of oral or written communications that either contain

false or misleading statements or omit material facts.  (*People v. Simon* (1995) 9 Cal.4th 493, 496.)  Securities fraud can be committed, not only by making "an untrue statement of a material fact," but also by "omit[ting] to state a material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading." (Corp. Code, § 25401.)  A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in reaching an investment decision, under all the circumstances.  *(People v. Butler* (2012) 212 Cal.App.4th 404, 421 (*Butler*).)

A "'[s]ecurity'" includes an investment contract and interest in a limited liability company.  (Corp. Code, § 25019.)  "'Whether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case.  In arriving at a determination the courts have been mindful that the general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon.'"  (*People v. Figueroa* (1986) 41 Cal.3d 714, 736, 740 [determination of facts relevant to whether instrument is a security "was for the jury in the first instance, not for the trial court"].)

. . . .

For the same reasons we have already discussed, sufficient evidence also supports Dunham's convictions for securities fraud.  On appeal, Dunham principally contends the Cherokee Village "lots" did not qualify as securities under the Corporations Code.  As to interests in GCREF, Dunham acknowledges that they were securities and mainly argues that statements to GCREF investors were not misleading when considered with the PPM's disclosures.

A transaction is an investment contract, and therefore a security, if it satisfies the "federal test" described in *SEC v. W.J. Howey Co.* (1946) 328 U.S. 293, 298–299 (*Howey*).  (*Consolidated Management Group, LLC v. Department of Corporations* (2008) 162 Cal.App.4th 598, 610.)  "Under the federal test, an investment contract consists of an investment of money in a common enterprise with the expectation of profits produced by the efforts of others."  (*Reiswig v. Department of Corporations for State of California* (2006) 144 Cal.App.4th 327, 335.)  The test disregards form for substance and focuses on economic reality.  (*Ibid*.)

In *Howey*, the Supreme Court analyzed certain land transactions and discussed that they were investment contracts. (*Howey*, *supra*, 328 U.S. at pp. 299-300.) The court noted that the investors, who resided in distant localities and lacked proper experience or the desire to develop the land themselves, were offered "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents." (*Ibid*.) The court further discussed the unfeasibility of individual development and the investors' reliance on "respondents or third parties with adequate personnel and equipment . . . to achieve their paramount aim of a return on their investments." (*Id*. at p. 300.) The land sales contracts and warranty deeds served as a convenient way to determine the investors' "respective shares in this enterprise." (*Ibid*.)

Here, like in *Howey*, Dunham offered investors an opportunity to contribute money and to share in the profits of a Cherokee Village retirement community, which would be managed, sold, and partly owned by Dunham. The lots represented the victims' "shares in [the] enterprise." (*Howey*, *supra*, 328 U.S. at p. 300.) None of the California victims had any ability to develop homes in Arkansas, and they expected "Dunham and company" to sell their lots for them. The victims were relying on Dunham to bring professional management, homebuilding, and financing experience to the project. They had no desire to live in Arkansas themselves, except possibly Marilyne who would consider it after first realizing a profit. The victims sought a return on their investment, and a profitable retirement community required a certain volume of lots to succeed. On a whole, and considering the purpose of our securities laws to protect the public from fraudulent investment schemes, the Cherokee Village lot transactions qualified as investment contracts.

Regarding Dunham's sales of interests in GCREF, the jury necessarily found that the PPM and related documentation did not adequately negate misleading oral statements made to David and James. Substantial evidence supports the jury's finding. Assuming the victims read the PPM in full, many of the disclosures were boilerplate and did not inform investors that ALC possessed the exclusive right to market delinquent lots or any implications from the ALC-SID contractual arrangement. The jury reasonably found that Dunham made materially misleading statements to the investors in GCREF, which were not corrected or clarified by the PPM.

Dunham points out that David and Joyce visited Cherokee Village and attended Dunham's seminars before converting their lots into GCREF shares

56

and that James and Allison represented themselves as accredited investors, i.e., possessing a net worth of over $1 million. Regardless, none of the victims learned of ALC's contractual arrangement with the SID by visiting Cherokee Village or by attending Dunham's seminars. Those events did not contradict what victims had been told. In addition, an offeror/seller of securities may not make false statements in connection with the offer of a security regardless of whether an investor is accredited. (Corp. Code, § 25401; 17 C.F.R. § 230.500 [transactions exempt from registration requirements but not antifraud or state securities laws] ).

In summary, substantial evidence supports Dunham's convictions for elder theft, one count of grand theft as to James and Allison, and securities fraud (counts 2, 3, 5, 7, 8, 10, 11, 13, 14, 15, 16, 17, 19 & 20).

(Lodgment No. 83, ECF No. 28-83 at 20, 25-28.)

"[California] Corporations Code sections 25401 and 25540 'criminalize the sale or purchase of securities by means of oral or written communications which either contain false or misleading statements or omit material facts . . . ." *People v. Black*, 8 Cal. App. 5th 889, 899 (2017), quoting *People v. Simon*, 9 Cal. 4th 493, 496 (1995). California courts have defined the inquiry into whether something is a security under California law as follows:

"[T]he corporate securities laws do not contain an 'all-inclusive formula by which to test the facts in every case. And the courts have refrained from attempting to formulate such a test. Whether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case. In arriving at a determination the courts have been mindful that the general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon.' " (*Figueroa*, *supra*, 41 Cal.3d at p. 736, 224 Cal.Rptr. 719, 715 P.2d 680, quoting *People v. Syde* (1951) 37 Cal.2d 765, 768, 235 P.2d 601.)

Corporations Code section 25019 defines "security" by listing transactions and instruments deemed to be securities, including "any note; stock; . . . bond; . . . evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; . . . investment contract; . . . or, in general, any interest or instrument commonly known as a 'security . . . .'" This list is "expansive," but is not applied literally.

(*Figueroa*, *supra*, 41 Cal.3d at p. 734, 224 Cal.Rptr. 719, 715 P.2d 680; *Reiswig v. Department of Corporations* (2006) 144 Cal.App.4th 327, 334, 50 Cal.Rptr.3d 386 (*Reiswig*).)  Rather, "the 'critical question' . . . is whether a transaction falls within the regulatory purpose of the law regardless of whether it involves an instrument which comes within the literal language of the definition."  (*Figueroa*, *supra*, at p. 735, 224 Cal.Rptr. 719, 715 P.2d 680.)

California courts have relied on two distinct tests in evaluating an alleged security: the risk capital test and the federal or *Howey* test.  The risk capital test, articulated by the California Supreme Court in *Silver Hills Country Club v. Sobieski* (1961) 55 Cal.2d 811, 815, 13 Cal.Rptr. 186, 361 P.2d 906 (*Silver Hills*), describes "'[1] an attempt by an issuer to raise funds for a business venture or enterprise; [2] an indiscriminate offering to the public at large where the persons solicited are selected at random; [3] a passive position on the part of the investor; and [4] the conduct of the enterprise by the issuer with other people's money.'"  This test reflects the court's assessment that the term "security" is defined broadly in order "to protect the public against spurious schemes, however ingeniously devised, to attract risk capital."  (*Id*. at p. 814, 13 Cal.Rptr. 186, 361 P.2d 906.)

The federal or *Howey* test, formulated by the United States Supreme Court in *Howey*, *supra*, 328 U.S. at page 301, 66 S.Ct. 1100, asks "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others."  A common enterprise "may be established by showing 'that the fortunes of the investors are linked with those of the promoters,'" such as by a profit sharing arrangement.  (*S.Ei.iC. v. R.G. Reynolds Enterprises, Inc.* (9th Cir. 1991) 952 F.2d 1125, 1130.)  An expectation of profits produced by the efforts of others exists "when '"the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."'"  (*Id*. at p. 1131.)

It is generally accepted that both the risk capital and federal tests may be applied, either separately or together; a transaction is a security if it satisfies either test.  (*Consolidated Management Group, LLC v. Department of Corporations* (2008) 162 Cal.App.4th 598, 610, 75 Cal.Rptr.3d 795; *Reiswig*, *supra*, 144 Cal.App.4th at p. 334, 50 Cal.Rptr.3d 386; but see *People v. Graham* (1985) 163 Cal.App.3d 1159, 1166-1167, 210 Cal.Rptr. 318.)

*Id*. at 899-900.

In order for the jury to have convicted Dunham of securities fraud, they had to find: (1) Dunham made "an untrue statement of material fact or omitted to state a material fact necessary in order to make the statement made . . . not misleading"; and (2) he "did so by written or oral communications in connections with the offer or sale of a security"; and (3) at the time he offered the security, Dunham either knew his statements or omissions were false, was "criminally negligent in failing to know or discover that a representation or omission" was false, or knew or was criminally negligent "in failing to discover that an omitted fact was material. (Lodgment No. 7, ECF No. 28-7 at 137.) Dunham contends there was insufficient evidence presented to permit the jury to conclude that the Cherokee Village lots were "securities" within the meaning of the statute because the promises he made regarding development of Cherokee Village were too vague to qualify as "managerial efforts." (Pet., ECF No. 1 at 11-12, 48-52, 170-71, 253-57.) Further, he claims he did not make any material untrue facts or omissions. (*Id.*)

*Untrue Statement or Omission of a Material Fact*

As discussed in section IV(C)(4)(b)(i) of this Order, there was sufficient evidence to support the jury's conclusion that Dunham's statements, which were made either directly by Dunham or through his agents Fisher and Martin, regarding his real estate development experience, the potential for profits from the development and his failure to disclose ALC's role – including ALC's sales of Cherokee Village lots on eBay, their refusal to enter into a non-compete agreement or agree on a sales price with Dunham, and their virtually inexhaustible supply of Cherokee Village lots ensured by their contract with the SID – constituted misrepresentations and omissions. Dunham did not have the real estate experience he claimed he had and each of the victims testified they did not know about ALC or its role in the Cherokee Village lot sales. (Lodgment No. 20, ECF No. 28-20 at 23-24, 52-56, 152-154, 164; Lodgment No. 21, ECF No. 28-21 at 9-10, 13, 18-19, 36-37, 76-78, 106-07, 170-71, 196, 197; Lodgment No. 22, ECF No. 28-22 at 32-34; Lodgment No. 23, ECF No. 28-23 at 158-59, 161, 163-64, 166.)

In addition, there was sufficient evidence presented to support the jury's

conclusion that the untrue statements and omissions were material. The jury was instructed that "[a] fact is 'material' if there is a substantial likelihood that, under all the circumstances, a reasonable investor would consider it important in reaching a decision." (Lodgment No. 7, ECF No. 28-7 at 138.) Fisher and Martin told the victims that the Cherokee Village project would be successful in large part because Dunham was a successful real estate developer with a lot of experience. (Lodgment No. 20, ECF No. 28-20 at 20-25, 152-54; Lodgment No. 21, ECF No. 28-21 at 76, 18-19, 170.) Jurors could conclude from this testimony that a reasonable person would consider Dunham's purported real estate development acumen as a vital fact to their decision whether to invest. In addition, a rational jury could conclude from the evidence that Dunham's failure to tell the victims about ALC's role in the Cherokee Village lots was a material omission because ALC's access to an unlimited supply of lots, their resultant ability to undercut any sale price of the Village lots, and their continued sale of lots on eBay would have been important to anyone purchasing Cherokee Village lots at the time.

Dunham contends the Private Placement Memorandum (PPM) given to the GCREF investors (counts 15 and 17) disclosed the risk factors involved in the purchase of shares in the fund. (Pet., ECF No. 1 at 11-12, 48-52, 170-71.) But as Respondent notes, none of the information about ALC or its role in Cherokee Village lots was disclosed in the "risk factors" section of the PPM. (Lodgment No. 61, ECF No. 28-61.) A rational jury could conclude that the lack of information about ALC, either oral though Fisher and Martin or written through the PPM, was a material omission.

*Whether the Lots Were "Securities"*[4]

The jury in Dunham's case was instructed with the *Howey* test. (Lodgment No. 7, ECF No. 28-7 at 143.) The instruction read, in pertinent part, as follows:

> The term "security, includes any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, membership in an incorporated or

---

[4] Dunham does not dispute the shares in GCREF were securities under California law.

18cv0863 GPC (LL)

unincorporated association, transferrable share, investment contract, certificate of deposit for a security, or, in general, any interest or instrument commonly known as a "security."

"Security" also includes an investment contract. An investment contract is a transaction in which a person entrusts money or other capital to another, with the expectation of deriving a profit, income or some financial benefit from a common enterprise, the failure or success of which is dependent upon the managerial efforts of other persons.

In order to prove the existence of a security in the form of an investment contract, each of the following elements must be proved:

1.  An investment was made;
2.  In a common enterprise;
3.  With the expectation of profit, income or some financial benefit.
4.  Derived from the managerial efforts of others.

(Lodgment No. 7, ECF No. 28-7 at 143.)

Dunham argues there was insufficient evidence for the jury to conclude the Cherokee Village lot purchases were securities because the expected profits from the investment were not "derived from the managerial efforts of others." (Pet., ECF No. 1 at 11-12, 48-52.) He contends they were simply purchases of individual lots by individual investors. As discussed in section IV(C)(4)(b)(i) above, all of the victims testified they were told they were purchasing lots or interests in GCREF in order to be part of and profit from a future retirement development, that Dunham would oversee the development, and that Dunham had the experience to make the development a success and that the lots would increase in value over time as the project took shape. (Lodgment No. 20, ECF NO. 28-20 at 152-53, 23-24; Lodgment No. 21, ECF No. 28-21 at 9-19, 75-77, 170-97; Lodgment No. 23, ECF No. 28-23 at 153-59.) None of the victims, with the possible exception of Jay and Marilyne A. who testified they considered using one of the lots they owned for a retirement home, planned to develop their lots themselves. (Lodgment No. 20, ECF No. 28-20 at 24, 153; Lodgment No. 21, ECF No. 28-21 at 9-10, 79, 173; Lodgment No. 23, ECF No. 28-23 at 158-59.) The evidence also established

18cv0863 GPC (LL)

Dunham himself thought of the lot purchases as "common enterprise" that he was managing. After the victims purchased the lots, Dunham held events at which plans for the development and a marketing campaign were described. (Lodgment No. 20, ECF NO. 28-20 at 25-26, 161-63; Lodgment No. 21, ECF No. 28-21 at 26-29, 88-89, 74-75, 174.) Taken together, a rational jury could conclude from the evidence presented that the Cherokee Village lots were not simply independent real estate transactions but rather a security within the meaning of the statute. *See e.g., SEC v. Schooler*, 905 F.3d 1107, 1113 (9th Cir. 2018) (general partnership interest in real estate constituted a security).

### Knowledge of Falsity

As discussed in section IV(C)(4)(b)(i) of this Order, Dunham knew the statements and omissions he made were false. Despite his representations, Dunham knew he was not a wildly successful real estate investor who had been involved in thousands of real estate deals. He also knew about ALC's role in Cherokee Village and that his development ideas would not be successful given ALC's continued sale of lots on eBay, its access to an unlimited supply of lots that could be sold for less than Dunham's, and ALC's refusal to agree to a non-compete agreement or a set price for lots.

The state court's application of *Jackson* was not objectively unreasonable because "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *Bell*, 535 U.S. at 694. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Dunham is not entitled to relief as to this claim.

### 5. *Admission of Evidence (Ground Seven)*

Dunham argues in ground seven that his federal constitutional rights to a fair trial were violated when the trial court admitted uncharged acts evidence. (Pet., ECF No. 1 at 12-13, 63-67.) Specifically, Dunham contends the trial court should not have admitted testimony from Giles Sensenbrenner, Steven Dickson, John Nicholson and Charles Shipp. (*Id.*) He also contends the jury was improperly instructed with regard to this evidence. (*Id.*)

Dunham raised this claim in the petition for review he filed in the California Supreme Court. (Lodgment No. 86, ECF No. 27-42.) The California Supreme Court denied the petition without citation of authority. (Lodgment No. 87, ECF No. 28-87.) Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim to determine whether the denial was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Ylst*, 501 U.S. at 805-06. That court wrote:

1. *Admitted Testimony*

During trial, the jury heard testimony from G.S., Steven D., John N., and Charles. The jury was instructed at the start of G.S.'s testimony that it could only consider his testimony as evidence of the intent to defraud. At the behest of Dunham in 2005, G.S. exchanged his Laguna Beach property worth over $2 million for Cherokee Village lots of supposedly equal value. Dunham guaranteed G.S. would recoup a large amount of cash in a year. In 2006, instead of paying him back, Dunham convinced G.S. to transfer the lots to a company called "Vision," which would sell the lots "through an infomercial." G.S. complied, but never got any money out of the deal. Dunham later told him that someone else in Cherokee Village was selling lots for less than Dunham could, causing the investment to fail.

The jury was similarly instructed that Steven's testimony was being introduced for the limited purpose of showing intent to defraud. Steven and his wife gave Dunham $200,000 to invest in an energy company (Stirling), which Dunham said "would go public" in six or 12 months. The company did not go public or "go anywhere," and eventually went bankrupt. Steven and his wife also invested $280,000 in GCREF. In 2008, Steven discovered problems with the finances of GCREF and organized a meeting with Dunham to get some answers. According to Steven, Dunham misspent the funds of GCREF, e.g., overpaid himself management fees, did not have supporting paperwork for over a half million dollars in Cherokee Village properties, spent $652,000 to purchase a Laguna Beach property unrelated to Cherokee Village, purchased art for his office, spent excessively on attorney fees, and funded his own health insurance. Steven believed that Dunham "use[d] assets from the Gold Coast Real Estate Fund for his personal needs."

John was also advised by Dunham to invest in Stirling before it went public. John contributed over $200,000 to Rodan. Dunham told him that

Rodan was holding shares in a company called JRM Ventures, which in turn held shares in Stirling. Dunham further told John that he would not lose money because he was part owner of Rodan, but later refused to recognize John's ownership interest. John lost his entire investment.

Charles had been a lobbyist for Stirling and testified Stirling "never had any generic plans or real plans to go public." Because Charles was heavily invested in GCREF, he worked with Dunham to try and alleviate or undo the ALC-SID contractual arrangement. During their legal proceedings against ALC, Charles found out that all of the lots held by GCREF had been or were being foreclosed for failure to pay taxes. In Charles's opinion, Dunham's telling GCREF investors that lots were worth $7,200 "was a scam" because Dunham knew he could buy a lot for $700. Further, Charles believed that "there was never a market in Cherokee Village. Mr. Dunham fabricated the market in Cherokee Village."

### 2. Analysis

Under Evidence Code section 1101, subdivision (a), evidence of prior misconduct is generally not admissible to prove an individual has a propensity to commit crimes in general or the crimes charged. However, such evidence is admissible to prove some other fact such as motive, opportunity, intent, preparation, knowledge, identity, or absence of accident or mistake. (Evid. Code, § 1101, subd. (b); *People v. Balcom* (1994) 7 Cal.4th 414, 422 (*Balcom*); *People v. Kipp* (1998) 18 Cal.4th 349, 369.) Evidence of other acts or uncharged crimes is admissible to prove that a defendant possesses the requisite specific intent in the charged crime. (*People v. Gallego* (1990) 52 Cal.3d 115, 171 [where defendant admitted act of killing but denied intent to kill, evidence that defendant had killed others was admissible to prove intent and motive].)

"The probative value of this evidence stems from the similarity between the uncharged offenses and the charged offenses . . . ." (*Balcom*, *supra*, 7 Cal.4th at p. 427.) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant "'probably harbor[ed] the same

intent in each instance." [Citations.]"' (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).) A greater degree of similarity is required to prove the existence of a common design or plan. (*Ibid.*)

The court must further determine whether the probative value of defendant's prior misconduct is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *Ewoldt*, *supra*, 7 Cal.4th at p. 404.) We review a trial court's evidentiary rulings for abuse of discretion. (*People v. Gray* (2005) 37 Cal.4th 168, 202 (*Gray*).)

We conclude the trial court did not abuse its discretion in admitting evidence of Dunham's prior misconduct for the purpose of showing intent to defraud the Cherokee Village victims and an absence of mistake. His defense was primarily that he had made a mistake and did not intend to defraud investors. Yet in Dunham's current and past investment schemes, innocent investors would fund his companies and suffer the brunt of losses, while he seemed only to benefit from the use of investors' funds. Dunham's dealings with the witnesses was sufficiently similar to his dealings with the victims to negate mistake. Most of the witnesses described the same investment opportunity in Cherokee Village as the one presented to the victims. Regarding investments in Stirling, Dunham told investors the company was soon "going public," which caused them to give him or his companies large sums of money. However, Stirling did not ever have "real plans" to go public, and it eventually went bankrupt. The similar results supported an inference that Dunham probably harbored an intent to defraud.

Although these witnesses' testimony was lengthy, we cannot say the court abused its discretion in implicitly finding that the probative value was not substantially outweighed by the danger of undue prejudice or confusion. The prior act witnesses had more direct interactions with Dunham than the victims. For example, Charles was a coplaintiff with Dunham to sue ALC, and Hall was a real estate agent who visited Cherokee Village with Dunham. They had greater insight into Dunham's plans and state of mind. The witnesses' testimony was no more inflammatory or emotional than the elderly victims' testimony.

Dunham argues the jury was incorrectly instructed that it could consider prior misconduct evidence to determine whether he had a plan or scheme to commit the charged offenses. The People argue the error was

harmless in light of the instruction that the evidence could be considered to infer Dunham's intent to defraud, the strong evidence of his guilt, and admonitions to the jury during the witnesses' testimony that the evidence was being introduced on the issue of intent.

Assuming that Dunham's prior misconduct could not be considered as evidence of a common plan, we conclude any error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Malone* (1988) 47 Cal.3d 1, 22 [error in admitting other-crimes evidence is reviewed under *Watson* standard].) It is not reasonably likely Dunham would have obtained a more favorable result because evidence of his prior misconduct was properly admitted for the purpose of showing his intent to defraud, and the jury was instructed to consider it for that purpose. (See *Gray*, *supra*, 37 Cal.4th at p. 204 [assuming error to admit evidence on the issue of intent to commit rape and sodomy, admission could not have been prejudicial because evidence was properly admitted on the issues of identity and intent to kill].) The jury was specifically so instructed during a few of the witnesses' testimony, and the prosecutor repeatedly argued the jury should consider Dunham's prior misconduct on the issue of intent to defraud, as pertained to the theft by false pretense counts. It is unlikely the evidence was improperly used, and ample evidence irrespective of Dunham's prior misconduct established the elements of each charged offense. There was no reversible error.

(Lodgment No. 83, ECF No. 28-83 at 43-48.)

A state court's erroneous evidentiary ruling cannot form the basis for federal habeas relief unless federal constitutional rights are affected. *Whelchel v. Washington*, 232 F.3d 1197, 1211 (9th Cir. 2000) (citing *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987)). "While a petitioner for federal habeas relief may not challenge the application of state evidentiary rules, he is entitled to relief if the evidentiary decision created an absence of fundamental fairness that 'fatally infected the trial.'" *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996) quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986). "[A] trial court's ruling does not violate due process unless the evidence is 'of such quality as necessarily prevents a fair trial.'" *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (internal quotation marks omitted). Admission of evidence violates due process "[o]nly if there are no permissible inferences the jury may

draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). If a due process error is found, the Court must then determine if it had a "substantial and injurious effect in determining the jury's verdict." *Brecht*, 507 U.S. at 622.

As Respondent notes, there is no clearly established Supreme Court law which holds that prejudicial evidence is inadmissible or violates due process. Indeed, the Supreme Court expressly reserved deciding that issue in *Estelle*, 502 U.S. at 75, n.5; *see Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008); *Alberni v. McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006). The Ninth Circuit has noted:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, [citation omitted], it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application.

*Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (citing *Williams v. Taylor*, 529 U.S. 362, 375 (2000) and *Carey*, 549 U.S. at 77).

In any event, even if the uncharged acts evidence was improperly admitted it did not have a substantial and injurious effect on the verdict. *Brecht*, 507 U.S. at 638. As discussed above in section IV(C)(4), there was sufficient, if not overwhelming, evidence supporting the elder theft and securities theft counts independent of the uncharged acts evidence. Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Bell*, 535 U.S. 685, 694. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Dunham is not entitled to relief as to this claim.

### 6. *Jury Instructions (Ground Eight)*

In grounds eight and nine, Dunham contends the jury was improperly instructed in two different ways. He claims the jury instructions should have contained definitions for the term "obligation" in the theft by false pretense instructions and the word "trust" in the

embezzlement instructions. (Pet., ECF No. 1 at 13, 52-56.) Respondent contends Dunham is not entitled to federal habeas corpus relief because jury instructions are generally a matter of state law. (Answer, ECF No. 27-1 at 199-200.) In the alternative, Respondent argues the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (*Id.* at 200-04.)

Dunham raised this claim in the petition for review he filed in the California Supreme Court. (Lodgment No. 86, ECF No. 31-35.) The California Supreme Court denied the petition without citation of authority. (Lodgment No. 87, ECF No. 28-87.) Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim to determine whether the denial was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Ylst*, 501 U.S. at 805-06. That court wrote:

> Here, the trial court gave approved jury instructions regarding the offenses of theft by false pretenses and embezzlement. Defense counsel did not request clarification or amplification of the terms "obligation" or "trusted," and we are not convinced the trial court had a sua sponte to do so. The terms are commonly understood, and Dunham has not demonstrated they have different nonlegal and legal meanings. He incorrectly argues the "trust" element in embezzlement requires a fiduciary relationship. In *People v. Wooten* (1996) 44 Cal. App. 4th 1834, the court stated: "The crime of embezzlement requires the existence of a 'relation of trust and confidence,' similar to a fiduciary relationship, between the victim and the perpetrator. (*Id.* at p. 1845.) *Wooten* does not suggest that a "relation of trust and confidence" may *only* be achieved through a fiduciary relationship. (*Ibid.*) The court had not duty to expand upon the meanings of the terms "obligation" and "trust" in the absence of a specific request.

(Lodgment No. 83, ECF No. 28-83 at 53.)

Instructional error can form the basis for federal habeas corpus relief only if it is shown that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [citation omitted]." *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (citing *Cupp v. Naugh'ten*, 414 U.S. 141, 146 (1973)); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). To establish a due process violation, "the defendant

must show both that the instruction was ambiguous and that there was "'a reasonable likelihood'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)). A petitioner who seeks to establish a due process violation as a result of an instruction that accurately states the elements of the crime carries an "especially heavy burden." *Waddington*, 555 U.S. at 190 (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977) (internal quotation marks omitted)).

"A defendant . . . is not entitled to an instruction with wording of his own choosing." *United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010) (citing *United States v. Ferris*, 719 F.2d 1405, 1408 (9th Cir.1983)). Thus, "the question before us is not whether the instruction [the defendant] posed was correct, but whether the instruction actually given was misleading or inadequate to guide the jury's decision." *Id.* (citing *United States v. Tatoyan*, 474 F.3d 1174, 1179 (9th Cir. 2007)). As the state court noted, the instructions given for the theft by false pretense and embezzlement counts were standard CALCRIM jury instructions. (*See* Lodgment No. 7, ECF No. 28-7 at 132-34 [CALCRIM Nos. 1804 and 1806].) They accurately described the elements of the offenses and the jury was instructed that in order to find Dunham guilty they were required to find those elements were proven beyond a reasonable doubt. *See Fenderson*, 188 Cal. App. 4th at 636; *Hartley*, 248 Cal. App. 4th at 627; Cal. Penal Code § 484, 503; Lodgment No. 7, ECF No. 28-7 at 104 [CALCRIM No. 220]. The words "obligation" and "trust" are common terms the jury was fully capable of understanding and applying without further guidance. Accordingly, the state court denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Yarborough*, 540 U.S. at 4. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Dunham is not entitled to relief as to this claim.

7. *Notice of the California Penal Code § 186.11 Allegation (Ground Nine)*

In ground nine, Dunham contends he did not receive sufficient notice of the

California Penal Code § 186.11 allegation because it was not contained in the sixth amended information, the final information filed against him. (Pet., ECF No. 1 at 14, 73-75, 181-82, 311-18.) He contends his federal constitutional right to have adequate notice of the charges against him was violated. (*Id.*) He also contends any restitution order that resulted from the § 186.11 charge was improper as a result. (*Id.*)

Dunham raised this claim in the petition for review he filed in the California Supreme Court. (Lodgment No. 86, ECF No. 31-35.) The California Supreme Court denied the petition without citation of authority. (Lodgment No. 87, ECF No. 28-87.) Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim to determine whether the denial was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Ylst*, 501 U.S. at 805-06. As to the restitution portion of the claim, the Court has determined it is technically exhausted but procedurally defaulted, and, in any event, meritless. (*See* Section IV(B) of this Order.) The state appellate court analyzed the claims as follows:

> We conclude the People complied with the pleading requirements of sections 186.11 and 1203.045. In the sixth amended information, under the grand theft, elder theft, and securities fraud counts, the People alleged (1) the transaction date; (2) the victim's name; and (3) the fact that a victim's loss exceeded a certain amount, such as $50,000 or $150,000. Thus, the underlying *facts* supporting the taking of more than $500,000 in fraud-related counts and the theft of an amount exceeding $100,000 were alleged. The specific statutory provisions under count 20 in the "charge summary" put Dunham on notice that the People sought to establish the aggravated white collar crime enhancement and the probation-exclusion provision based on counts 1-20. The statutes do not strictly require the Penal Code section be placed in the same sentence or under the same heading as the underlying facts. (See *People v. Riva*, (2003) 112 Cal.App.4th 981, 1001 [analogous enhancement statute "only requires the facts necessary to sustain the enhancement be alleged in the information; it does not say where in the information those facts must be alleged or that they must be alleged in connection with a particular count in order to apply to that count."].)

> Moreover, we are satisfied based on our review of the record that Dunham had adequate notice of the People's intention to seek the

enhancements for counts 1 through 20 and considered those counts as related felonies involving fraud and embezzlement. The original complaint alleged, "as to all counts," that Dunham committed a theft exceeding the value of $100,000 within the meaning of section 1203.045, subdivision (a), and that the aggravated white collar crime enhancement applied because "[h]e committed two or more related felonies, a material element of which is fraud and embezzlement . . . [and] involved the taking of more than five hundred thousand dollars . . . ." This language was carried through, more or less, to the fourth amended information, on which Dunham was arraigned. Although the wording was inadvertently dropped from the sixth amended information, the underlying factual allegations supporting the white collar crime enhancement and probation exclusion provision, coupled with the statutory provisions in the charge summary, remained. Finally, instruction No.'s 42 and 43 instructed the jury to determine whether the People had proven the aggravated white collar crime enhancement and probation exclusion provision based on counts 1 through 20. There was no deprivation of due process.

(Lodgment No. 83, ECF No. 28-83 at 60-62.)

"The Sixth Amendment guarantees a criminal defendant the fundamental right to be informed of the nature and cause of the charges made against him so as to permit adequate preparation of a defense." *Gautt v. Lewis*, 489 F.3d 993, 1002 (9th Cir. 2007) (citing U.S. Const. amend. VI and *Cole v. Arkansas*, 333 U.S. 196, 201 (1948)). Although the information need not need cite to a specific statute, "the substance of the information . . . must in some appreciable way apprise the defendant of the charges against him so that he may prepare a defense accordingly." *Id*. at 1004; *see also Givens v. Housewright*, 786 F.3d 1378, 1380 (9th Cir. 1986). "An information is not constitutionally defective if it states 'the elements of an offense charged with sufficient clarity to apprise a defendant of what to defend against.'" *James v. Borg*, 24 F.3d 20, 24-25 (9th Cir. 1994). *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985) (quoting *Russell v. United States*, 369 U.S. 749, 763-64 (1962) [citations omitted]).

Every charging document filed in Dunham's case contained the § 186.11 allegation in the charge summary section of the information. (Lodgment No. 3, ECF No. 28-3 at 21-47, Lodgment No. 4, ECF No. 28-4 at 613-38; Lodgment No. 5, ECF No. 28-5 at 63-

74; Lodgment No. 7, ECF No. 28-7 at 21-32, 77-99.)  In addition, the facts underlying the § 186.11 charge – the victims' names, the date of the offenses, the minimum dollar amount stolen – was also contained in the sixth amended information.  (*Id.*)  Moreover, counsel did not express surprise at or object to the § 186.11 jury instruction, indicating he was well aware that the allegation was part of the charges against Dunham.  (Lodgment No. 9, ECF No. 28-9 at 175.)  The state appellate court's denial of this claim, therefore, was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Bell*, 535 U.S. 694.  Nor was it based on an unreasonable determination of the facts.  28 U.S.C. § 2254.  Dunham is not entitled to relief as to this claim.

As to Dunham's claims regarding restitution, Respondent is correct that challenges to restitution orders are not cognizable in federal habeas corpus proceedings.  *Bailey v. Hill*, 599 F.3d 976, 979-84 (9th Cir. 2010).  Accordingly he is not entitled to relief as to his restitution claim.

### 8. *Prosecutorial Misconduct (Ground Ten)*

Dunham claims the prosecutor committed "pervasive misconduct," and cites four kinds of misconduct he alleges the prosecutor committed during closing argument: misstatements of law, improper comments about the jury's deliberations, denigration of defense counsel, and improper hypotheticals.  (Pet., ECF No. 1 at 14-15, 69-73.)  He also contends that the cumulative effect of the misconduct rendered his trial fundamentally unfair.  (*Id.*)  Respondent argues the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer, ECF No. 27-1 at 215-33.)

In order to find a prosecutor's actions amount to misconduct, "[i]t is not enough that the prosecutor's remarks [or actions] were undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Rather, a prosecutor commits misconduct when his or her actions "'so infect . . . the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).)  "[T]he appropriate standard of review for such a

claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Id*. (quoting *Donnelly*, 416 U.S. at 642.) "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (citing *United States v. Baker*, 10 F.3d 1374, 1415 (9th Cir. 1993)). "Prosecutorial misconduct which rises to the level of a due process violation may provide the grounds for granting a habeas petition only if that misconduct is deemed prejudicial under the "harmless error" test articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 [citations omitted] (1993)." *Shaw v. Terhune*, 380 U.S. 473, 478 (9th Cir. 2004).

Dunham raised these claims in the petition for review he filed in the California Supreme Court. (Lodgment No. 86, ECF No. 31-35.) The California Supreme Court denied the petition without citation of authority. (Lodgment No. 87, ECF No. 28-87.) Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim to determine whether the denial was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Ylst*, 501 U.S. at 805-06.

i.    *Misstatements of Law – Burden of Proof*

Dunham contends the prosecutor in his case made several misstatements of law during closing argument. He claims the prosecutor made several comments that improperly shifted the burden of proof to the defense and missated the law with regard to the securities fraud counts. The state appellate court concluded that the claims were waived and, in the alternative, they did not amount to misconduct:

> During closing argument, the prosecutor stated:
>
> "Either side in this case has the obligation to produce all evidence or call all witnesses imaginable in the case, but if there

> is logical evidence that could have been presented by either side, it is fair to comment on the defense inability to present other checks and other money."

The court sustained defense counsel's objections as a misstatement of law on the burden of proof and admonished the jury that the court would instruct on the issue with a specific instruction. During his closing argument, defense counsel criticized the People for not producing certain evidence regarding ALC and argued that the evidence was nonexistent in light of the fact that the information would be "available particularly" to the government due to subpoena powers. In rebuttal, the prosecutor argued:

> "There is an instruction that says neither side is required to call all witnesses who may have information about the case or to produce all physical evidence that might be relevant, so the defendant is presumed innocent, and we've always told you from day one we have the burden of proof beyond a reasonable doubt. [Dunham] has no obligation to prove anything, and now we're being attacked because we didn't subpoena the eBay records. Well, there is no doubt that [ALC] never stopped selling their eBay lots."

Defense counsel did not object to or request an admonition for the prosecutor's rebuttal comments. On appeal, Dunham argues that the prosecutor's rebuttal comments were improper.

The prosecutor did not commit misconduct. The prosecutor was anticipating and rebutting the notion that the People failed to produce certain records to establish ALC's sales of lots on eBay. The jury would not reasonably construe the prosecutor's comments as shifting the burden of proof, since he made clear that Dunham was not required to call any witnesses or produce any evidence and that the People had the burden of proof.

Dunham also contends the prosecutor misstated the law regarding securities fraud, unanimity, circumstantial evidence, constructive notice and loss enhancements. In some instances, Dunham did not object to the prosecutor's statements, and, when he did, the court sustained his objections. Dunham's counsel did not request any curative admonitions. Based on our review of the record, timely objections and requests for admonition would not have been futile. The court sustained defense objections to perceived

misstatements in the law regarding the prosecution's burden and admonished the jury that the court would instruct on that issue (see *ante*.)  As a result, Dunham's claim is forfeited as to other alleged misstatements of law. (*People v. Edwards* (2013) 57 Cal.4th 658, 736.)

Nevertheless, we have reviewed the prosecutor's remarks and conclude there was no misconduct.  The prosecutor would typically read the law from the jury instructions, and then go on to apply the law to the facts.  The prosecutor reiterated to the jury at the outset of his argument that "the packet" of written instructions was "the official instruction."  His explanation of the law was not misleading simply because he emphasized certain legal elements or used shorthand terminology.  Closing arguments were relatively long given the number of crimes and facts to review, and the prosecutor was entitled to focus more attention on certain elements to the exclusion of others.  If he misspoke, he would go back to the written instructions.  The prosecutor's methods were not reprehensible or deceptive.

(Lodgment No. 83, ECF No. 28-83 at 54-56.)

"Prosecutors may comment on the failure of the defense to produce evidence to support an affirmative defense so long as it does not directly comment on the defendant's failure to testify." *Cook v. Schriro*, 538 F.3d 1000, 1020 (9th Cir. 2008) (citing *Lockett v. Ohio*, 438 U.S. 586, 595 (1978)).  The prosecutor's first comment fell within this ambit, as he did not refer to Dunham's failure to testify but rather noted the defense had not produced evidence to support its claim that Dunham had not defrauded the victims but rather had simply fallen victim to the recession.  The second comment was in direct response to the defense attorney's closing argument in which he attacked the prosecution for failing to subpoena records to support their claim that ALC continuously sold Cherokee Village lots on eBay:

[MR. CARLOS]: We know that somebody checked with Bill Clark, $10,000 to $14,000 lots.  Those were uncontroverted.  Do we have one piece of paperwork one title, one deed?  This is the District Attorney's Office.  It is essentially the government.  They have the ability – they have subpoena powers.  They can go and they can go down to title and find out exactly what lots were sold on eBay by who and for what price.  Did we have one piece of evidence presented to you during the six weeks?  Not one, not one piece.  Is it Mr. Dunham's role to do that?  No.  The reason – ask yourself why that

hasn't been presented. Where is the evidence and where is the proof?

(Lodgment No. 28, ECF No. 28-28 at 218-219.)

"In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." *United States v. Young*, 470 U.S. 1, 12 (1985). Here, defense counsel called the jury's attention to the prosecution's failure to present evidence of ALC's sales, and the prosecutor did not commit misconduct in responding to that argument. The state appellate court correctly concluded that the prosecutor's remarks were in response to defense counsel's closing argument, particularly since the prosecutor explicitly told the jury that Dunham was presumed innocent, the prosecutor had the burden to prove Dunham guilty beyond a reasonable doubt, and that Dunham had "no obligation to prove anything." (Lodgment No. 29, ECF No. 28-29 at 51.)

 ii. *Misstatements of Law – Securities Fraud*

Next, Dunham contends the prosecutor misstated the law of securities fraud in two ways. First, he claims the prosecutor told the jury they need only find that Dunham had made a material omission and disregarded the requirement that "the omission render the sales pitch misleading." (Lodgment No. 80, ECF No. 28-80 at 128-29.) During the two instances Dunham complains of, the prosecutor explained what a material omission was. During the first instance, he told the jury that in order to convict Dunham they had to find he told a "material lie," or a "material omission." (Lodgment No. 28, ECF No. 28-28 at 121.) He also told them Dunham had to know the lie or omission was "important." (*Id.*) During the second instance, he told the jury a lie or omission was material if "under all the circumstances a reasonable investor would consider it important. Did you get all the facts? Are you an informed investor? Do you feel comfortable giving up your life savings to this guy? Do you feel like you got all the information you needed?" (*Id.* 121-22.) The state appellate court addressed this claim as follows:

  Dunham also contends the prosecutor misstated the law regarding

securities fraud, unanimity, circumstantial evidence, constructive notice and loss enhancements. In some instances, Dunham did not object to the prosecutor's statements, and, when he did, the court sustained his objections. Dunham's counsel did not request any curative admonitions. Based on our review of the record, timely objections and requests for admonition would not have been futile. The court sustained defense objections to perceived misstatements in the law regarding the prosecution's burden and admonished the jury that the court would instruct on that issue (see *ante*.) As a result, Dunham's claim is forfeited as to other alleged misstatements of law. (*People v. Edwards* (2013) 57 Cal.4th 658, 736.)

Nevertheless, we have reviewed the prosecutor's remarks and conclude there was no misconduct. The prosecutor would typically read the law from the jury instructions, and then go on to apply the law to the facts. The prosecutor reiterated to the jury at the outset of his argument that "the packet" of written instructions was "the official instruction." His explanation of the law was not misleading simply because he emphasized certain legal elements or used shorthand terminology. Closing arguments were relatively long given the number of crimes and facts to review, and the prosecutor was entitled to focus more attention on certain elements to the exclusion of others. If he misspoke, he would go back to the written instructions. The prosecutor's methods were not reprehensible or deceptive.

(Lodgment No. 83, ECF No. 28-83 at 54-56.)

The prosecutor did not misstate the law. He accurately described the materiality requirement of the crime. (*See* Lodgment No. 7, ECF No. 28-7 at 137.) Moreover, in the context of this case, a reasonable juror would interpret the prosecution's statement that the material lie or omission had to be "important" to mean the lie or omission would affect a person's decision had they known about it. This is consistent with the jury instructions given to the jury. In any event, even if the prosecutor's statement was confusing or misleading, the jury had a correct instruction for the securities fraud offense which they could refer to during deliberations and were also instructed that they were to refer to the written instructions they were given as the correct statement of the law, not the statements of the attorneys. (*Id.* at 101.) Jurors are presumed to follow the instructions given to them. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

Dunham also argues the prosecutor misstated the law regarding when a transaction

is an "investment contract" for purposes of the definition of a security because he told the jury it did not matter whether the victims maintained possession and control of the lots. (Pet., ECF No. 1 at 5, 69-70, 178-79.) The instruction defining a security included language directing the jury to "look through the mere form to the substance of the transaction" to determine whether the transactions were securities as opposed to a simple land deal. The prosecutor was within the scope of argument to suggest that the form of the transaction – the sale of lots – obscured its actual substance, which was an "investment . . . made in a common enterprise [w]ith the expectation of profit . . . [and] derived from the managerial efforts of others." (*See* Lodgment No. 7, ECF No. 28-7 at 143.) "Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja*, 97 F.3d at 1253.

  iii. *Misstatements of Law – Unanimity Instruction*

  Dunham contends the prosecutor improperly argued the prosecutor referred to statements made by Dunham at the La Costa seminar and during his civil deposition, which occurred after the victims purchased Cherokee Village lots and GCREF shares, as supporting the element of false representation for the elder theft counts or misrepresentation of a material fact for the security fraud counts. The prosecutor pointed to those statements, however, as evidence supporting corroborating what Fisher and Martin believed about Dunham and what they communicated to the victims at the time of their purchase:

  [MR. JIMENEZ]: So what are the material omissions? What are the material lies in this case? Let's talk about, first, let's talk about the lies. First, we know that Fisher sold a lot of these lots, and we know Fisher is excited about the defendant's background. He said it. I don't remember the exact quote, but something along the lines of this is one of the most extraordinary men I've ever met in my life. I thought he was talking about the Dalai Lama. That is the opinion Fisher has of the defendant, and you can tell on the video he's sincere about it. He thinks that.

  Mr. Fisher goes on and on talking about the defendant's background,

how when he was a little boy instead of playing ball on the streets like normal kids, he would follow his dad around and learn all about the real estate industry, and the defendant says, I also own a broker dealer securities company and advisor firm on Wall Street.

. . . .

[Dunham] acknowledged in the video that Fisher's clients are in the room. We're talking about the La Costa video. He acknowledges that Fisher has been telling them the infomercial is going to air soon, or the exact quote is, he's been sharing with you guys. He told us he's been sharing with you guys about the media campaign we're going to do. It's not like Dunham doesn't know that Fisher is going around telling people, hey, the infomercial is coming. He knows. He says it.

(Lodgment No. 28, ECF 28-28 at 130-31.)

As Respondent notes, the La Costa presentation and the civil deposition were evidence corroborating Fisher's testimony that he told the victims Dunham was a real estate genius based on lies Dunham told him. As such, the prosecutor's statements were an appropriate comment on the evidence and reasonable inference that could be drawn from the evidence. *Ceja*, 97 F.3d at 1253.

iv.  *Misstatements of Law – Circumstantial Evidence*

Next, Dunham claims the prosecutor misstated the law regarding circumstantial evidence by stating as follows:

[MR. JIMENEZ]: If you can draw two reasonable conclusions, and the key term here is reasonable, you have to have two reasonable interpretations. If on reasonable interpretation points to innocence and another reasonable interpretation points to guilt, then you go with the innocence if you only have two reasonable interpretations and they both conflict, but if you have one interpretation that arguably can show innocence and when you weigh it against a boatload of interpretations that show guilt –

MR. CARLOS: Objection. Misstates the law.

THE COURT: Sustained.

MR. JIMENEZ: Let me continue reading the law. If you can draw

18cv0863 GPC (LL)

two or more reasonable conclusions from the circumstantial evidence – so that's the key – can you draw reasonable conclusions from the circumstantial evidence? We're not talking about unreasonable conclusions. Were talking about reasonable conclusions. Consider the totality of the evidence and decide what's a reasonable conclusion based on this.

(Lodgment No. 28, ECF No. 28-28 at 162.)

The prosecutor attempted to explain, albeit inartfully, that only reasonable conclusions could be drawn from circumstantial evidence. Upon the objection being sustained, he then correctly described the circumstantial evidence instruction. The error does not rise to the level of misconduct. *Darden*, 477 U.S. at 181.

     v.    *Misstatements of Law – Constructive Notice for the Statute of Limitations*

Dunham argues the prosecutor misstated the law regarding constructive notice for the statute of limitations instruction. The prosecutor stated:

[MR. JIMENEZ]: The statute of limitations begins from the date of discovery or the date that you reasonably should have discovered it. That's basically the rule of the statute of limitations.

The crime should have been discovered when the victim was aware of facts that would have alerted a reasonably diligent person in the same circumstances to the fact that a crime may have been committed, and that's the key fact here, a crime had been committed.

I suspect Mr. Carlos is not going to touch this section because his whole argument is there's no crime. There's no lies. There's no intent. It's the economy's fault. The defendant did not commit a crime, so he can't come back and say, but the victims should have known there was a crime. There was no crime, but they should have known it was a crime. He can't argue both.

. . . .

So here's another table. On the outside date when Mrs. Duncan hired the attorneys from Gaston and Gaston, the outside date when they hired Gaston and Gaston – when she hired Gaston and Gaston – was May something, let's just say May 1st. And the prosecution of her case began March 15th. So that's three years, ten months, clearly within the statute.

That's assuming she should have known a crime was committed. I suspect [sic] to you Mrs. Duncan had no way of knowing. Gaston and Gaston had no way of knowing a crime was committed. They hadn't even deposed the defendant. The didn't know about American Land Company. They didn't know about the material misrepresentations. How do you know if there is a material omission or misrepresentation, without deposing the defendant, without knowing about American Land Company?

(Lodgment No. 28, ECF No. 28-28 at 199-200.)

The jury instruction for the statute of limitations read, in pertinent part, that in order to convict Dunham, the jury had to find that "the prosecution began within 4 years of the date the crimes were discovered or should have been discovered." (Lodgment No. 7, ECF No. 7 at 154.) It further told the jury that "[a] crime should have been discovered when the victim was aware of facts that would have alerted a reasonable diligent person in the same circumstances to the fact that a crime may have been committed." (*Id.*) Taking the prosecutor's comments in context there was no misstatement of law and thus no misconduct. *Darden*, 477 U.S. at 181; *Smith*, 455 U.S. at 219.

### vi. *Misstatements of Law – Enhancements*

The California Penal Code § 12022.6 enhancement alleged against Dunham required the jury to find that the loss suffered by the victims was more than $65,000. Cal. Penal Code § 12022.6(a)(1) (repealed Jan. 1, 2018). Dunham claims the prosecutor misstated the law when he told the jury that in order to find the § 12022.6(a)(1) allegation true, they had to determine whether Dunham took *or* caused a loss of more than $65,000. (Lodgment No. 28, ECF No. 28-28 at 112.) Dunham contends the penal code section states the jury must determine whether he took *and* caused a loss of more then $65,000. *Id.*

"Section 12022.6, subdivision (a) states: 'When any person takes, damages, or destroys any property in the commission or attempted commission of a felony . . . [and] the loss exceeds sixty-five thousand dollars ($65,000), the court . . . shall impose an additional term of one year.'" *People v. Denman*, 218 Cal. App. 4th 800, 810 (2013). As

the jury instruction states, the elements of the crime are:

1.   In the commission of the crime, the defendant took property;

   AND

2.   When the defendant acted, he intended to take the property;

   AND

3.   The loss caused by the defendant's taking the property was greater than $65,000.

(Lodgment No. 7, ECF No. 28-7 at 150.)

Assuming the prosecutor misstated the law, the jurors were nonetheless properly instructed on the elements of the enhancement.  (*Id.*)  They were told they were to follow the written instructions and not the statements of the attorneys regarding the law.  (*Id.* at 101.)  Jurors are presumed to follow the instructions they are given.  *Richardson*, 481 U.S. 206.  No due process violation occurred.

   vii.   *Comments About Jury Deliberations*

Dunham also points to comments the prosecutor made about jury deliberations as misconduct.  Specifically, he contends the comments communicated to the jury that they had to reach a verdict, which in turn infringed on the jury's deliberative process.  (Pet., ECF No. 1 at 14-15, 69-73.)  The state appellate court addressed this claim as follows:

   Dunham contends the prosecutor improperly demanded a verdict from the jury and invited them to consider "extraneous factors."  The prosecutor urged the jurors to try and reach a verdict, e.g., "Your goal is not to come here and waste your time.  Your goal is to have a verdict."  The prosecutor had earlier mused to the jury, "Imagine having to do this case over again."  Defense counsel's objections were sustained, and he declined the court's offer for a curative admonition.

   The claim is forfeited and, in any event, did not rise to the level of misconduct.  The court properly instructed the jury to "try to agree on a verdict if you can."  The prosecutor corrected himself later on in closing argument to specifically refer to the official instruction and urged the jurors

to be "patient" with each other.  In context, the prosecutor's comments merely reiterated the jury's responsibilities and did not invite them to consider factors outside of the evidence.

(Lodgment No. 83, ECF No. 28-83 at 56-57.)

The first instance of the prosecutor infringing on the jury's deliberation process occurred when he was explaining to the jury what they needed to decide with regard to material facts:

[MR. JIMENEZ]:  I want to emphasize another important point in this question.  This is an important point.  I want to turn this off so we can talk about it.  You heard evidence of many material lies, what I submit to you are material lies, and you've heard evidence of what I submit to you are material omissions.  So the law does not require you to be convinced beyond a reasonable doubt that every single omission that I say happened was material or, in fact, was proven or every single lie that the defendant made was material or was, in fact, proven.  I want to be crystal clear about this.  During deliberations, if Juror No. 6 says, I'm convinced beyond a reasonable doubt –

MR. CARLOS:  Objections.  Improper argument.

THE COURT:  Sustained.

MR. JIMENEZ:  Let me rephrase that.  If in deliberations – not in deliberations.  That's what got me in trouble, the word deliberations, so let me correct that.  If one of you says, I'm convinced beyond a reasonable doubt that the fact that he said he had –

MR. CARLOS:  Same objection, your Honor.

THE COURT:  Sustained.

MR. JIMENEZ:  All right. Let me go to the law.  This is what the law says, and then we'll talk about it.  As long as each of you is convinced beyond a reasonable doubt that the defendant committed some acts or omissions that prove the course of conduct, you need not all rely on the same acts or omissions to reach that conclusion.  So what does that mean?

(Lodgment No. 28, ECF No. 28-28 at 128.)

While the prosecutor should not have discussed the juror's deliberation process, it is clear from the record that the comments were in the context of explaining a particular jury instruction to the jury. The prosecutor quickly returned to actual text of the instruction and the jury was also given that instruction before deliberations. Under these circumstances, the state appellate court's conclusion that the comments did not constitute misconduct was not an unreasonable application of Supreme Court law. *Bell*, 535 U.S. at 694.

The second instance Dunham complains of occurred when the prosecutor was discussing the need to take deliberations seriously:

> [MR. JIMENEZ]: Juries don't get fooled. Either the evidence is there or it's not. The jury is limited by the evidence they see. They're not presented with the evidence, then they can't make a decision. That's not the jury's fault, that's our fault.
>
> But the system doesn't work if people deliberate in a hurry. I know you have hectic lives. I know the defendant and the victims want a verdict soon, but please take your time. Please do it right. You only have a little bit left. Be open minded. Don't show up to deliberations and say, okay, I made up my mind. Let's go. Listen and be open to the fact that your fellow jurors might have a different point of view. You might be wrong, so please be kind, be courteous, and listen to what people have to say. Be open to the possibility that you might change your mind.
>
> Consider only the evidence. Again, the evidence is testimony and exhibits. Use your common sense, use your life experience but don't – we can have a mistrial if you go on googling, researching, talking to friends. Imagine having to do this case over again. Imagine another jury having to listen to what you listened to six months or a year from now and the victims having to testify again is one you doesn't follow –
>
> MR. CARLOS: Objection, your Honor. That's improper argument.
>
> THE COURT: Sustained.
>
> MR. JIMENEZ: Please follow the law, consider only the evidence, deliberate, have no bias, pity or prejudice. I want to emphasize that you are objective, you are neutral here. Don't think that the defendant is a relative

of yours. Don't treat him like a relative of yours when you are deciding this case. Just like if you were a first base umpire, you wouldn't be allowed to be the umpire if your relatives were batting. You wouldn't be on this jury if he was relative. Probably hoping your relative wouldn't do these things, but the bottom line is you have to be objective.

(*Id.* at 167-68.)

The prosecutor's remarks were given in the context of reminding the jury the instructions tell them not to go outside what was presented in court and to only consider the evidence in order not to risk a mistrial. Though the prosecutor's remarks could have been clearer, upon objection he immediately returned to the language of CALCRIM No. 200 and 3550. (*See* Lodgment No. 7, ECF No. 28-7 at 101 ("It is up to you, exclusively, to decide what happened, based only on the evidence that has been presented to you in this trial. Do not let bias, sympathy, prejudice or public opinion influence your decision. . . . You must follow the law as I explain it to you, even if you disagree with it."), at 155 ("You should try to agree on a verdict if you can . . . . Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other.").) The state court's determination that this did not amount to prosecutorial misconduct was not an unreasonable application of Supreme Court law.

The third instance Dunham complains of occurred during the prosecutor's discussion of the different elements of each crime and the need for the jurors to consider each count separately:

[MR. JIMENEZ]: Now we're going to talk about grand theft and the different theories of culpability. The law says we have multiple counts in this case and each count – each of the counts charged in this case is a separate crime. They have different requirements. They have different requirements. You're going to hear the term specific intent, specific intent, to do something. That's not required in securities law. It's consumer protection not buyer beware. No reliance. It's an entirely different crime with different requirements.

What I'm urging you to do is follow this instruction and consider each count separately and return a separate verdict for each count. Don't lump

them all together. The law is not the same for all these counts. You still have to analyze the evidence and determine what are the facts? Who do you believe? What are the exhibits? You apply the law that is given – in some circumstances you are given the option of determining if certain laws apply or not, and I'll talk about that in a minute, and then obviously we need a verdict. That's your goal. We need a verdict. The defendant wants a verdict. My victims want a verdict.

MR. CARLOS: Objection, your Honor. Improper argument.

THE COURT: Sustained.

MR. JIMENEZ: That is your goal. Your goal is not to come here and waste your time. Your goal is to have a verdict.

MR. CARLOS: Objection, your Honor. Can we go sidebar?

THE COURT: Yes.

(*Id.* at 169-70.)

The state court's determination that the prosecutor did not commit misconduct was reasonable. *Bell*, 535 U.S. at 694. As with the preceding instances, when an objection was sustained, the prosecutor returned to the jury instructions he was attempting, inelegantly, to explain. (*See* Lodgment No. 7, ECF No. 28-7 at 148 [CALCRIM No. 3515] ("Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one.").) Moreover, the prosecution's statement that the jury's goal is to have a verdict is echoed in the final instruction, entitled "Pre-Deliberation Instructions," which tells the jury that they "should try to agree on a verdict if you can." (*Id.* at 155.)

"It is . . . improper for the prosecutor to state that the duty of the jury is to find the defendant guilty." *United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999). It is also improper for a judge to coerce jurors by telling them they must reach a verdict. *Jenkins v. United States*, 380 U.S. 445, 446 (1965). But neither of these scenarios are present in Dunham's case. The prosecutor's statements could be characterized as

inelegant or sloppy characterizations of the law and jury instructions, but they do not rise to a due process violation. *Darden*, 477 U.S. at 181.

viii. *Comments Denigrating Defense Counsel*

Dunham also argues the prosecutor committed misconduct when he made denigrating comments about and laughed at defense counsel. (Pet., ECF No. 1 at 14-15, 69-73.) The California Court of Appeal analyzed the claim as follows:

> Dunham contends the prosecutor frequently denigrated defense counsel, citing instances where the prosecutor argued that defense counsel was misstating the law and an instance where the prosecutor laughed (and later apologized) during counsel's argument that the People had not sufficiently investigated Dunham's real estate experience.
>
> "A defendant's conviction should be based on the evidence adduced at trial, and not on the purported improprieties of his counsel. [Citation.] When a prosecutor denigrates defense counsel, it directs the jury's attention away from the evidence and is therefore improper. [Citation.] In addressing a claim of prosecutorial misconduct that is based on the denigration of opposing counsel, we view the prosecutor's comments in relation to the remarks of defense counsel, and inquire whether the former constitutes a fair response to the latter." (*People v. Frye* (1998) 18 Cal.4th 894, 978.)
>
> Here, Dunham did not object to any of the prosecutor's comments and therefore forfeited his claim. In any case, the prosecutor did not denigrate defense counsel or impugn his integrity. The prosecutor explained that the "lack of investigation" argument was ludicrous, as shown by specific evidence in the case establishing Dunham's lack of real estate experience – his deposition testimony. In addition, when the prosecutor argued that defense counsel had misstated the law, it was in the context of applying a specific legal element to the facts. The prosecutor's remarks were a fair response to defense argument challenging the sufficiency of evidence to meet certain legal elements. In each instance, the prosecutor refocused and redirected the jury to the evidence adduced at trial. The prosecutor's comments were not improper.

(Lodgment No. 83, ECF No. 28-83 at 57-58.)

A prosecutor may not attack defense counsel's ethics or integrity "absent specific evidence in the record." *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998) (citing

United States v. Frederick, 78 F.3d 1370. 1380 (9th Cir. 1996)); *Bruno v. Rushen*, 721 F.2d 1193, 1195 (9th Cir. 1983). But as noted above, "counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja*, 97 F.3d at 1253-54. Here, the prosecutor's remarks were well within the latitude afforded counsel during closing arguments because they were made in reference to the application of the law to the facts and were not "ad hominem" attacks on defense counsel's integrity or ethics. *See Sassounian v. Roe*, 230 F.3d 1097, 1106 (9th Cir. 2000) (declining to find prejudice where the prosecutor implied that defense counsel fabricated evidence, the judge sustained objections to the misconduct and instructed the jury that the attorneys' arguments did not constitute evidence, and the misconduct was limited to a few incidents during trial); *Williams*, 139 F.3d at 744-45 (finding no prejudicial misconduct when prosecutor referred to defense's closing argument as "trash"). As to the prosecutor laughing during defense counsel's argument, such behavior is clearly inappropriate and the prosecutor acknowledge that it was and apologized. (Lodgment No. 29, ECF No. 28-29 at 45.) But even if such behavior rose to the level of a due process violation, it did not have a substantial and injurious effect on the jury's verdict. *Brecht*, 507 U.S. at 622. It was a brief moment in a lengthy trial and during a lengthy closing argument.

      ix.   *Hypotheticals*

Dunham contends the prosecutor's use of particular hypotheticals to illustrate how to apply jury instructions was "gratuitously inflammatory." (Pet., ECF No. 1 at 15, 69-73.) The prosecutor used rape as an example to illustrate circumstantial evidence, child molestation to illustrate the idea that Dunham omitted material facts about Cherokee Village and GCREF, and the mafia to illustrate agency liability. (Lodgment No. 28, ECF No. 28-28 at 119-20, 135, 161; Lodgment No. 29, ECF No. 28-29 at 143-44.) The state appellate court concluded there was no misconduct:

      Dunham asserts the prosecutor used unnecessarily inflammatory

hypotheticals during his closing argument, and the hypotheticals involved crimes like rape, molestation, and murder.  The claim is forfeited to the extent Dunham failed to object and, in any event, did not constitute prosecutorial misconduct.  For example, when explaining the difference between direct and circumstantial evidence, the prosecutor used the example of a rape victim's testimony identifying her assailant (direct evidence) versus DNA (circumstantial evidence).  The prosecutor was trying to illustrate legal principals relevant to the jury's role, and no reasonable juror would misconstrue the prosecutor's hypothetical examples.  (See *People v. David* (1995) 10 Cal.4th 463, 537-538.)

(Lodgment No. 83, ECF No. 28-83 at 58.)

As the state court found, the prosecutor's comments were used to illustrate specific jury instructions and did not link the defendant to rape and child molestation.  Even if the comments were misconduct, they did not have a substantial and injurious effect on the outcome of the trial.  *Brecht*, 507 U.S. at 622.  In the context of the trial and closing arguments as a whole, the comments were brief and, as the state court noted, no reasonable juror would have interpreted the remarks as casting Dunham in the same light as a rapist, child molester or mafioso.  The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Bell*, 535 U.S. at 694.  Nor was it based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).

x.      *Violation of Court's Order on Uncharged Acts*

Finally, Dunham alleges the prosecutor violated the state court's order regarding uncharged acts evidence.  (Pet., ECF No. 1 at 15, 69, 72, 180.)  The trial judge ruled pretrial that the uncharged acts could be admitted as evidence of Dunham's intent but not as evidence of a common scheme or plan pursuant to California Evidence Code 1101(b).  (Lodgment No. 12, ECF No. 28-12 at 17-18.)  The judge instructed the prosecutor to "craft the instruction to reflect the ruling," and told the prosecutor he could not argue the uncharged acts were evidence of a common scheme or plan.  (*Id.* at 18.)  The jury instructions that went to the jury, however, told the jury they could consider the uncharged acts as evidence of Dunham's intent to defraud the victims and as evidence

that Dunham had a common scheme or plan 'to commit the alleged offenses. (Lodgment No. 7, ECF No. 28-7 at 129.) The prosecutor also argued to the jury that they could use the uncharged acts as evidence of Dunham's intent to defraud and as evidence of a common scheme or plan. (Lodgment No. 28, ECF No. 28-28 at 178-87.) The state appellate court denied the claims as follows:

> Dunham contends the prosecutor intentionally violated the court's order regarding the admission of prior misconduct evidence for a limited purpose. (See p. III.A.) This claim is meritless. Defense counsel did not object to the jury instructions or the prosecutor's recitation of the law, and the prosecutor repeatedly argued the prior misconduct evidence was introduced to show Dunham's intent to defraud. The record does not support that the prosecutor intentionally violated a court order.

(Lodgment No. 83, ECF No. 28-83 at 58.)

The prosecutor's argument regarding Dunham's intent to defraud and the uncharged acts evidence is almost 10 pages long. (Lodgment No. 28, ECF No. 28-28 at 178-87.) The prosecutor's reference to the incorrect jury instruction was one line in a lengthy argument that focused the jury's attention on Dunham's intent to defraud. There is no evidence the incorrect jury instruction's inclusion was anything other than an inadvertent error, and, as the state court noted, defense counsel did not object to either the instruction or the argument. (*Id.* at 179.) Even if the prosecutor's conduct rises to the level of a due process violation, it did not have a substantial and injurious effect on the outcome of the trial. *Brecht*, 507 U.S. at 622. Under these circumstances, the state court's denial of this claim was neither contrary to, nor an unreasonable application of clearly established Supreme Court law. *Bell*, 535 U.S. at 694. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

### xi. Cumulative Prosecutorial Misconduct

Dunham contends the cumulative effect of the prosecutorial misconduct in his case violated his due process right to a fair trial. (Pet., ECF No. 14-15, 180-81.) The state appellate court addressed this claim as follows:

> Dunham contends the cumulative impact of the prosecutor's

misconduct and/or trial court's errors requires reversal. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) "'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 2009 (*Cunningham*).)

As we have discussed, the prosecutor did not commit misconduct and, in any event, there was no cumulative prejudicial effect. (*People v. Martinez* (2003) 31 Cal.4th 673, 704.) Additionally, based on our review of the entire record, the trial court's few errors were harmless and did not individually or collectively deprive Dunham of a fundamentally unfair trial. "[Dunham] was entitled to ta fair trial but not a perfect one." (*Cunningham*, *supra*, 225 Cal.4th at p. 1009.) There was no violation of due process.

(Lodgment No. 83, ECF No. 28-83 at 59.)

The Ninth Circuit has stated "[t]he Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)); *see also Whelchel*, 232 F.3d at 1212; *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (stating that where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant"). Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *Frederick*, 78 F.3d at 1381 (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)). Cumulative error warrants habeas relief only where the combined effect of the errors had a "substantial and injurious effect or influence on the jury's verdict." *Parle*, 505 F.3d at 927 (quoting *Brecht*, 507 U.S. at 637).

This Court has found that none of the claims Dunham has presented amounted to

constitutional error. Because no errors occurred, no cumulative error is possible. *Hayes v. Ayers*, 632 F.3d 500, 523-24 (9th Cir. 2011) (stating that "[b]ecause we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible"). Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, and Petitioner is not entitled to relief for his cumulative error claim. *Williams*, 529 U.S. at 412-13.

### 9. *Ineffective Assistance of Counsel (Ground Eleven)*

In claim eleven, Dunham argues that as to the claims the state appellate court concluded were forfeited, trial counsel's failure to object or ask that the jury be admonished, and thereby forfeiting those claims, constituted ineffective assistance of counsel. (Pet., ECF No. 1 at 16-17, 74-75.) Dunham raised this claim in the petition for review he filed in the California Supreme Court. (Lodgment No. 86, ECF No. 28-86.) Because that court denied the petition without citation of authority, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis. That court wrote:

> Dunham argues that if we conclude that any of his claims were forfeited, his trial counsel was ineffective for failing to sufficiently preserve the issue. His argument lacks merit. As we have discussed, even if the issues were properly preserved, there was no reasonable probability that Dunham would have obtained a more favorable ruling. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 (*Strickland*).)

> We also reject Dunham's assertion that his counsel was ineffective for failing to object to Investigator Brown's "chart" concerning the statute of limitations. In evaluating a claim of ineffective counsel, we must "indulge a strong presumption" that defense counsel's conduct constituted sound trial strategy. (*Strickland*, *supra*, 466 U.S. at 689.) Here, defense counsel may have reasonably chosen a strategy of focusing on the lack of any crimes to discover rather than appearing to blame the victims for failing to discover some fact. Indeed, counsel's failure to assert certain objections with regard to the statute of limitations proceedings in general was consistent with a strategy that there was no crime, or underlying facts suggestive of a crime, for any investor to discover. In addition, the investigator's chart was based on the evidence and merely showed the amount of time between certain

> events and the dates of prosecution. On this record, Dunham has not established a claim for ineffective assistance of counsel.

(Lodgment No. 83, ECF No. 28-83 at 64-65.)

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. He must also show he was prejudiced by counsel's errors. *Id*. at 694. Prejudice can be demonstrated by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993).

Further, *Strickland* requires "[j]udicial scrutiny of counsel's performance . . . be highly deferential." *Strickland*, 466 U.S. at 689. There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id*. at 686-87. The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Id*. at 697. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citations omitted). As the Supreme Court has stated, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

The state appellate court found the following claims were forfeited because trial counsel failed to object: (1) errors in the verdict forms (ground one); (2) errors in the jury instructions on theft (ground eight); (3) a violation of the pleading requirements for the California Penal Code§ 186.11 allegation (ground nine); and (4) prosecutorial misconduct (ground ten). The state appellate court nonetheless addressed those claims on

the merits and found no reversible error.  (*See* Lodgment No. 83, ECF No. 28-83.)  Having found no error as to those claims, the state court determined Dunham was not prejudiced by counsel's failure to object.  (*Id.* at 64-65.)  That conclusion is consistent with *Strickland*, and, in light of the court's finding that the underlying claims lacked merit, the denial of this claim was therefore neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Bell*, 535 U.S. at 694.  Nor was it based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  Dunham is not entitled to relief as to his ineffective assistance of counsel claims.

## V.    CONCLUSION

After considering the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer, the Traverse, the lodgments and other documents filed in this case, as well as the legal arguments presented by both parties, and for all the foregoing reasons, the petition is **DENIED.**

Rule 11 of the Rules Following 28 U.S.C. § 2254 require the District Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. § 2254 (West Supp. 2013).  A COA will issue when the petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253; *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005).  A "substantial showing" requires a demonstration that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'"  *Beaty v. Stewart*, 303 F.3d 975, 984 (9th Cir. 2002) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Here, the Court concludes Dunham has not made the required showing, and therefore a certificate of appealability is **DENIED**.

**IT IS SO ORDERED.**

Dated:  June 5, 2019

Hon. Gonzalo P. Curiel
United States District Judge

18cv0863 GPC (LL)